(No. 59276.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. PATRICK H. WRIGHT, Appellant.

*Opinion filed October 18, 1985.—Modified on denial*
*of rehearing February 21, 1986.*

132

134

CLARK, C.J., concurring in part and dissenting in part.
SIMON, J., dissenting.

Charles M. Schiedel, Deputy Defender, and Lawrence J. Essig, Assistant Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Jill Wine-Banks, Solicitor General, Mark L. Rotert, Terence M. Madsen and Scott Graham, Assistant Attorneys General, of Chicago), for the People.

JUSTICE MORAN delivered the opinion of the court:

Defendant, Patrick H. Wright, was charged by information, in the circuit court of Coles County, with the offenses of murder, attempted murder, home invasion, residential burglary, attempted rape, and armed robbery. (Ill. Rev. Stat. 1983, ch. 38, pars. 9—1(a)(1), 9—1(a)(2), 9—1(a)(3), 8—4(a), 11—1, 12—11, 19—3, 18—2(a).) Defendant's motion for a change of venue was allowed, and the cause was subsequently tried in Edgar County. Following a jury trial, the defendant was found guilty on all counts. A jury proceeding, for purposes of sentencing, was waived, and the parties agreed to a single death penalty hearing before the court. Pursuant to sections 9—1(d) and 9—1(h) of the Criminal Code of 1961 (Code) (Ill. Rev. Stat. 1983, ch. 38, pars. 9—1(d), 9—1(h)), the court, upon evidence adduced at trial and stipulated to by the prosecution and defense, made a first-stage finding of a statutory aggravating factor (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(b)(6)). Although finding that the murder was committed while the defendant was under the influence of extreme mental or emotional disturbance, the court concluded that the presence of that statutory mitigating factor (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(c)(2)) alone was insufficient to preclude a sentence of death. The court thereupon sentenced defendant to death on the murder conviction and also pronounced maximum concurrent sentences of 60 years' imprison-

ment for home invasion, armed robbery and attempted murder and 30 years' imprisonment for each of two counts of attempted rape. Defendant's motion for a new trial was denied, and he brings a direct appeal to this court (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(i); Ill. Const. 1970, art. VI, sec. 4(b); 87 Ill. 2d R. 603), alleging numerous errors at all stages of the proceedings.

Through an audio taped statement, made by the defendant and played before the jury, it was revealed that late in the evening of June 6, 1983, defendant entered the Mattoon, Illinois, apartment of Carol Specht and her daughter Connie. He stated that his plan was to burglarize the dwelling. Prior to entering the apartment the defendant, by peering through several windows, ascertained that at least one woman was at home, asleep on the couch. He decided that he would not curtail his plans because of the woman's presence. He reasoned that "if she gives me any trouble, I'll do away with her."

Carrying a flashlight and a fillet knife, the defendant entered the apartment through an open sliding glass door in Carol Specht's bedroom. He proceeded into the living room, where Carol Specht was asleep on the couch. Defendant put a knife to her neck as she began to awaken and forced her into her bedroom, where he tried unsuccessfully to rape her. He then bound and gagged the victim and began searching for money and other valuables. After putting several photographs and other items of personal property found in the victim's purse, wallet and dresser drawer in his pocket, defendant began searching the rest of the apartment.

During this search he discovered Connie Specht, asleep in her bedroom. Connie awakened, and the defendant asked her who she was and what her relationship was to Carol Specht. He then forced Connie into her mother's bedroom, telling her that he would kill her mother if she did not cooperate. Defendant abused Con-

nie sexually but was unable to rape her. He stated that he slashed Connie Specht's throat when she appeared to be begging for mercy. When he observed that the first cut was relatively small, he slashed her two more times in an attempt to rupture the jugular vein. He then began to inflict the stab wounds to Carol Specht's back which caused her death.

As the defendant left the apartment, he stumbled and lost his glasses. In an attempt to locate the glasses, he reached for his flashlight and discovered that it was missing. He reentered the apartment to search for the flashlight and observed Connie Specht phoning for help. Unable to find the flashlight, defendant fled from the scene.

At trial, the testimony of Connie Specht was consistent with the statement made by the defendant. The State, in its case in chief, also adduced the testimony of a number of other witnesses and introduced numerous exhibits into evidence. Because the facts of this case are not disputed, aside from the mental condition of the defendant at the time of the crime, the substance of this evidence will be recited only where necessary to a disposition of the issues.

The question of defendant's mental condition at the time he performed the acts giving rise to this action was raised, at trial, by the defense. The basic premise of this defense was that the psychosexual disorder involving shoe fetishism, from which defendant had long suffered, compelled his behavior and rendered him insane at the time he performed the acts in question. In support of this theory, the defendant, testifying on his own behalf, recalled a troubled childhood involving physical abuse and a 15-year period of institutionalization in mental hospitals necessitated by his psychosexual disorder. Defendant was first institutionalized at the age of 15. Defendant further testified that following this period of

institutionalization he was repeatedly involved in criminal activity. As a result, he spent the majority of the next nine years in prison.

In contradiction to his taped statement, wherein he stated that he broke into the Specht apartment for money and jewelry, defendant testified at trial that he was really looking for women's shoes but was ashamed to admit this to the policemen during his taped statement. Also in variance with his taped statement was his claim, on cross-examination, that he did not remember stabbing Carol Specht. In fact, on both direct examination and cross-examination defendant testified that, because of his mental condition, he was unable to control his actions during the incident.

A psychiatrist, Dr. William Fowler, testified as a rebuttal witness for the State. It was his opinion, after interviewing the defendant and considering police reports, the audio taped confession, and materials from previous incarcerations, that the defendant was not suffering from a mental disease at the time of the offense. Dr. Fowler stated that the defendant had probably never suffered from a mental illness. He characterized defendant's condition as a personality or psychosexual disorder.

The jurors were provided forms for verdicts of not guilty, not guilty by reason of insanity, guilty but mentally ill, and guilty for each of the charged offenses. They were instructed that the State, in addition to proving all of the elements of each of the charged offenses, was required to prove that the defendant was sane at the time of each of the offenses. In addition, the jurors were instructed that to find the defendant insane, and hence not criminally responsible for his conduct, they would have to conclude that because of a mental defect the defendant did not appreciate the criminality of his conduct or was unable to conform his conduct to the requirements of the law. Further, they were instructed

that "mentally ill" refers to a substantial disorder of thought, mood, or behavior which impairs a person's judgment at the time of the commission of an offense but not to the extent that he could not appreciate the wrongfulness of his behavior or conform his conduct to the requirements of the law. Rejecting defendant's insanity defense, as well as the guilty-but-mentally-ill alternative, the jury returned guilty verdicts on all counts.

At the sentencing hearing, the court found that the defendant had attained the age of 18 years or more at the time of the offense and that Carol Specht was killed during the course of another felony. During the second stage of the hearing, the defendant offered the testimony of a psychiatrist, Dr. Arthur Traugott, in mitigation. Dr. Traugott opined that while defendant was able to appreciate the wrongfulness of his behavior and conform his conduct to the requirements of the law, at the time of the offense, he was suffering from a mental illness which had an "overpowering influence" in determining his actions on the evening in question.

The court expressly found the presence of one statutory mitigating factor—"the murder was committed while the defendant was under the influence of extreme mental or emotional disturbance, although not such as to constitute a defense to prosecution." (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(c)(2).) The court also concluded, however, that the mitigating factor was insufficient to preclude the sentence of death, and thereafter defendant was sentenced to death.

We consider first the defendant's contention that his warrantless arrest was not supported by probable cause. Prior to trial, defendant moved to quash his arrest and suppress evidence. The following facts were revealed at the suppression hearing. Defendant testified that at approximately 2 a.m. on June 7, 1983, he was out walking in Mattoon when he was stopped by a city police officer

in a squad car. After producing identification, the defendant was told he was free to go. Shortly thereafter, however, he was stopped by three officers in three squad cars. Defendant was searched and handcuffed and transported to the Mattoon police department. Defendant stated that no arrest warrant was produced nor was he told that the officers had an arrest warrant.

Four police officers testified at the hearing. Officer Doug Heath stated that while on routine patrol on June 7, 1983, he was notified, at approximately 1:45 a.m. of a possible homicide. He arrived at the crime scene, where he was informed, by Sergeant Orville Brown, that there had been a homicide and an attempted homicide. He was advised that the surviving victim had described the perpetrator as a six-foot-tall white male with facial hair. In addition, he was told, by Sergeant Brown, that a pair of black-rimmed eyeglasses had been located which had tentatively been linked to the defendant. Officer Heath testified that he was familiar with the defendant, having encountered him at the police station on several occasions in the recent past. He further stated that defendant had always been wearing eyeglasses when he had seen him.

Officer Heath proceeded on his patrol of the area. Traffic was very light, and the officer observed only one woman before he spotted the defendant walking on a public street at approximately 1:50 a.m. Heath stated that he initially stopped the defendant for an identification check and then told him he was free to go. After receiving authorization from Assistant Chief Robert O'Dell, Heath again stopped the defendant, searched him, put him in handcuffs and, with the help of Lieutenant Stewart Walters, put him into the squad car and took him to the police station. Defendant was not wearing eyeglasses, and no eyeglasses were found on his person.

On cross-examination, Officer Heath admitted that he did not include the description of defendant or the information regarding the eyeglasses in his written police report. His report only stated that he was told that defendant was a possible suspect. Nevertheless, Officer Heath adhered to his testimony that he was provided with this information prior to the time he picked up the defendant.

The testimony of Lieutenant Stewart Walters indicates that he was called to the crime scene at 12:41 a.m. on June 7, 1983. As he approached the scene he observed a woman, later identified as Connie Specht, in the parking lot crying and yelling for help. Officers Carl Smith and Roger Claxon arrived at the same time. Lieutenant Walters testified that Connie Specht, who was holding her neck, was covered with blood. When Walters asked her what had happened she told him that a man in his mid-30's with dark hair, glasses and facial hair had harmed her and her mother. The three officers entered the apartment and discovered the body of Carol Specht.

Lieutenant Walters also testified as to the arrival of Assistant Chief Robert O'Dell and Detective David Plummer. The assistant chief briefly surveyed the scene and as he was leaving instructed Lieutenant Walters to secure the area. During Walter's search of the rear of the apartment, Officer Claxon called his attention to a pair of black-rimmed eyeglasses Claxon had discovered in a grassy area approximately 12 feet from the sliding glass doors that led into Carol Specht's bedroom. Walters stated that he "felt that [he] had seen a pair of glasses like that previously on [defendant]." Lieutenant Walters' familiarity with the defendant stemmed from his arrest of defendant several months prior to the incident in question, at which time he found defendant beside the window of a house in his (the lieutenant's) own neighborhood at 3 a.m. Defendant was wearing black plastic-

rimmed glasses at that time. Thus, when Captain David O'Dell arrived on the scene, Lieutenant Walters informed him that the defendant might be a "prime suspect." Walters was present at the time that the defendant was taken into custody by Officer Heath and stated that defendant was not wearing his glasses at that time. Lieutenant Walters could not recall seeing anyone wearing eyeglasses similar to those worn by the defendant. Walters' written report did not indicate that Connie Specht had informed him that the defendant had facial hair or wore eyeglasses.

Captain David O'Dell's testimony indicates that he also observed the glasses and recognized them as being the same type worn by the defendant. Captain O'Dell had seen the defendant in the Mattoon area numerous times during the spring of 1983 and had always seen him wearing black-framed eyeglasses. Captain O'Dell further testified as to his observation of a waffle pattern shoe print on the porch outside the Specht apartment. Captain O'Dell returned to the police station and reported his findings to Assistant Chief Robert O'Dell. Captain O'Dell, like Lieutenant Walters, could not remember seeing another person wearing the type of glasses he testified having seen the defendant wear and the type found by the police. It was revealed on cross-examination that Captain O'Dell's written report only recalled Lieutenant Walters' comments regarding the connection between the discovered glasses and the defendant. Although Captain O'Dell testified that he independently made the same connection and reported this to Assistant Chief Robert O'Dell, he did not note this in his report.

Assistant Chief Robert O'Dell testified that he advised Officer Heath to bring defendant to the police station based on the following information. When arriving at the Specht apartment, he was advised by Lieutenant Walters that Connie Specht had described the assailant

as a six-foot-tall white male with dark hair and facial hair. In addition, when the assistant chief viewed Carol Specht's ransacked bedroom, where some of the shoes appeared to be moved from a shoe container, he thought of the defendant, as he was aware of his problem with window peeking and women's shoes. Further, he was later advised by Captain O'Dell of the discovery of the glasses and the possible connection with defendant.

The court found that defendant had been arrested at the time he was transported to the police station. However, the court found that the warrantless arrest was supported by probable cause.

There is no question that defendant was under arrest when he was handcuffed and transported to the Mattoon police station, the circumstances being such that a reasonable man would conclude that he was not free to leave. (*United States v. Mendenhall* (1980), 446 U.S. 544, 554, 64 L. Ed. 2d 497, 509, 100 S. Ct. 1870, 1877; *People v. Eddmonds* (1984), 101 Ill. 2d 44, 61, *cert. denied* (1984), 469 U.S. 894, 83 L. Ed. 2d 207, 105 S. Ct. 271.) Under the Code of Criminal Procedure of 1963, a warrantless arrest is valid when a peace officer "has reasonable grounds to believe that the person is committing or has committed an offense." (Ill. Rev. Stat. 1983, ch. 38, par. 107–2(c).) The "reasonable grounds" standard has been interpreted as having the same meaning as "probable cause." *People v. Tisler* (1984), 103 Ill. 2d 226, 236-37.

Probable cause has been defined as existing where the police "have knowledge of facts which would lead a reasonable man to believe that a crime has occurred and that it has been committed by the defendant." (*People v. Eddmonds* (1984), 101 Ill. 2d 44, 60; see *Dunaway v. New York* (1979), 442 U.S. 200, 208 n.9, 60 L. Ed. 2d 824, 833 n.9, 99 S. Ct. 2248, 2254 n.9; *Brinegar v. United States* (1949), 338 U.S. 160, 175-76, 93 L. Ed.

1879, 1890, 69 S. Ct. 1302, 1310-11.) Further, decisions analyzing the probable cause standard reveal that it is a "practical, nontechnical conception." (*Illinois v. Gates* (1983), 462 U.S. 213, 231, 76 L. Ed. 2d 527, 544, 103 S. Ct. 2317, 2328.) "In dealing with probable cause, * * * we deal with probabilities. These are not technical; they are factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians act." *Brinegar v. United States* (1949), 338 U.S. 160, 175, 93 L. Ed. 1879, 1890, 69 S. Ct. 1302, 1310; see also *People v. Free* (1983), 94 Ill. 2d 378, 400, *cert. denied* (1983), 464 U.S. 865, 78 L. Ed. 2d 175, 104 S. Ct. 200.

Our review of the entire record, in light of these well-established principles, persuades us that the police had probable cause to arrest defendant at the time he was transported to the police station. The collective information known to the Mattoon police officers included a description of the perpetrator; the discovery of the eyeglasses tentatively linked to the defendant; Assistant Chief O'Dell's independent association of the disrupted shoe container with the defendant; and the presence of the defendant on a Mattoon street at approximately 2 a.m. without his glasses.

In addition, "[i]n determining whether the officer had probable cause, the officer's factual knowledge, based on his prior law-enforcement experience, is relevant." (*People v. Tisler* (1984), 103 Ill. 2d 226, 237.) Here, the officers were familiar with the defendant and were aware that he always wore glasses and had previously been involved with "window peeking" as well as having a problem with women's shoes. Further, when determining whether probable cause exists, a balance is struck between the interests of privacy and law enforcement. Where there is uncertainty as to whether a crime has been committed, the privacy rights may be given more consideration. (*People v. Reynolds* (1983), 94 Ill. 2d 160,

166; *People v. Lippert* (1982), 89 Ill. 2d 171, 179-80, *cert. denied* (1982), 459 U.S. 841, 74 L. Ed. 2d 85, 103 S. Ct. 92.) In the instant case, there was no doubt that a crime had been committed. The police were aware that a violent crime had been committed less than two hours before defendant was apprehended.

Although the defendant questions the credibility of the police officers because of omissions in their police reports, we find too many links connecting defendant with the incident to conclude that "his guilt was not 'probable,' in the fourth amendment sense, or that the trial court's determination that it was probable was against the manifest weight of the evidence." (*People v. Moody* (1983), 94 Ill. 2d 1, 9; see *People v. Stewart* (1984), 105 Ill. 2d 22, 41; *People v. Tisler* (1984), 103 Ill. 2d 226, 248.) As such, we conclude that the trial court was correct in finding that the warrantless arrest was supported by probable cause.

Defendant argues next that the trial court erred when it prevented defense counsel, on cross-examination, from eliciting Connie Specht's opinion as to defendant's sanity at the time of the crime. Defense counsel asked Connie Specht if defendant was acting "rather irrational" at the time of the crime. She replied, "I don't know. The only word that comes to mind is vicious." When defense counsel suggested "How about crazy?", the State objected. The court sustained the objection but overruled the State's objection to defense counsel's next question. He asked, "Had you ever seen anybody acting like that before?" Miss Specht answered that she had never seen anyone act like that, except possibly on television. When defense counsel attempted to elicit Miss Specht's opinion on whether specific acts performed by defendant were normal, the State again objected. The court allowed defense counsel to ask questions regarding what the defendant did and whether the witness had

ever observed this type of behavior but concluded that it would be improper for her to express her opinion as to whether such acts were normal or abnormal. Defense counsel then asked Miss Specht if she had ever seen or heard of anything in real life similar to specific sexual acts performed by defendant. Miss Specht replied negatively, and defense counsel concluded his cross-examination.

It is the defendant's position that since the theory of the case was insanity, Miss Specht's testimony on the issue was crucial. The State responds that defendant has waived any assignment of error since he did not allege the ruling as error in his post-trial motion. Further, the State argues that the defendant did not specifically seek to elicit Miss Specht's opinion concerning his sanity and a proper foundation could not have been laid for the introduction of Miss Specht's opinion concerning defendant's sanity because she did not observe enough of the defendant's conduct. Finally, the State maintains that any error was harmless beyond a reasonable doubt.

While we do not agree with the State that the defendant did not attempt to elicit Miss Specht's opinion as to defendant's sanity at the time of the incident, the record does establish that defendant did not raise the issue in his post-trial motion. Thus any claim of error in this regard is considered waived. *People v. Thurman* (1984), 104 Ill. 2d 326, 329; *People v. Caballero* (1984), 102 Ill. 2d 23, 31, *cert. denied* (1984), 469 U.S. 963, 83 L. Ed. 2d 298, 105 S. Ct. 362.

Moreover, had there been no waiver, we find that the defendant was not prejudiced by the trial court's ruling on the scope of cross-examination of Miss Specht. It is well established that a lay witness may give his opinion regarding the mental condition of an individual based on personally observed facts, which must be stated in detail. (*People v. Smothers* (1973), 55 Ill. 2d 172, 174; *People v.*

*Williams* (1967), 38 Ill. 2d 115, 123; Cleary & Graham, Illinois Evidence sec. 704.3 (3d ed. 1979); 4 Callaghan's Illinois Evidence sec. 7.27 (1964).) Nevertheless, "the scope of cross-examination rests largely in the discretion of the trial court, and we will overturn its ruling only where an abuse of that discretion results in manifest prejudice to the defendant." *People v. Owens* (1984), 102 Ill. 2d 88, 103; see also *People v. Brisbon* (1985), 106 Ill. 2d 342, 362.

Our review of the record indicates that when Miss Specht was asked to state her opinion as to the "irrational" nature of defendant's acts—essentially the same as "crazy" or "abnormal"—she was unable to give an opinion and concluded that she would describe the acts as "vicious." Thus, it is probable that Miss Specht was unable to give an opinion as to defendant's sanity. Further, when the trial judge inquired as to defense counsel's line of questioning, he explained to the court that he was "trying to get [Miss Specht] to show the jury that the specific acts that [defendant] performed—that none of the specific acts he performed were normal." While the court did not allow the witness to testify regarding her opinion as to the normalcy of those acts, he did allow her to be questioned as to the acts performed by the defendant as well as allowing her to state whether she had ever heard of or seen such behavior. The jury was, therefore, fully apprised of the defendant's actions during the incident through Miss Specht's testimony, and was made aware that such actions were beyond the realm of her life experiences. As such, the objective of defense counsel's questioning was adequately fulfilled. Under these circumstances, we find that the trial judge used reasonable discretion in limiting the cross-examination.

The defendant also argues that he was denied a fair trial where the State failed to comply with discovery.

Pursuant to Supreme Court Rule 412(a), defendant filed a pretrial motion for disclosure. (87 Ill. 2d R. 412(a).) A month prior to trial, the court entered an order requiring full compliance with the defendant's motion for disclosure, within seven days. The State filed its answer within this period and, in particular, stated that any tangible objects to be used at trial could be examined by defendant, upon reasonable notice, at the Mattoon police department or the Coles County State's Attorney's office, depending on where the items were located.

Defendant contends that while he went to these locations and viewed some evidence, most of the evidence was held at locations he was unaware of, such as the State Crime Laboratory in Springfield. As such, the balance of the physical evidence was not disclosed until the middle of trial. These items included the eyeglasses allegedly worn by defendant during the incident; a nightgown worn by Miss Specht; a deposit slip, theatre program, tools, and cloth gloves discovered at the scene; items taken from defendant following his arrest, including his pants, tennis shoes and a second flashlight; and an empty knife package found in a trash can at his apartment. Defendant maintains that because the State failed to timely produce these materials, he was denied the opportunity of intelligently deciding whether certain items of evidence should be scientifically tested as well as using the evidence for other purposes.

Initially, we would note that we are not faced with a situation where the State concealed its possession of tangible objects. As the State points out, and our review of the record reveals, defendant was provided with police reports and evidence receipts disclosing all items seized and subsequently taken to the crime laboratory in Springfield. In addition, defendant did receive scientific reports on some of these items.

Nor are we confronted with a violation of our Rule

412(c) (87 Ill 2d R. 412(c)), the codification of *Brady v. Maryland* (1963), 373 U.S. 83, 87, 10 L. Ed. 2d 215, 218, 83 S. Ct. 1194, 1196-97, which held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." None of the items at issue were favorable to the defendant. Rather, they all supported the State's case, placing the defendant at the scene as the perpetrator. Indeed, defendant never denied that he committed the offense. He made an expansive confession as well as testifying in detail at trial. See *People v. Coslet* (1977), 67 Ill. 2d 127, 131.

Nevertheless, Supreme Court Rule 412(a)(v) does require that the State, upon written motion of defense counsel, disclose "any books, papers, documents, photographs or tangible objects which the prosecuting attorney intends to use in the hearing or trial or which were obtained from or belonging to the accused." (87 Ill. 2d R. 412(a)(v).) Further, Supreme Court Rule 412(e) provides:

> "The State may perform these obligations in any manner mutually agreeable to itself and defense counsel or by:
>
>> (i) notifying defense counsel that material and information, described in general terms, may be inspected, obtained, tested, copied, or photographed, during specified reasonable times; and
>>
>> (ii) making available to defense counsel at the time specified such material and information, and suitable facilities or other arrangements for inspection, testing, copying and photographing of such material and information." (87 Ill. 2d R. 412(e).)

The defendant was entitled to see all of the tangible objects which the State intended to use, prior to trial. We cannot say, however, from our review of the record that

the State failed to comply with these discovery requirements. Defendant was aware of all evidence still being held in Springfield. No specific requests were made for the State to transport these items to a mutually agreeable location for inspection. We agree with the statement of the trial court that the discovery problems involved in this case resulted from misunderstanding and imprecise answers to pretrial discovery rather than an attempt to mislead or deceive. Moreover, even if the State did not exercise due diligence, noncompliance with Rule 412, in the absence of a showing that the evidence involved was favorable to defendant, does not mandate reversal without a showing of prejudice. *People v. Greer* (1980), 79 Ill. 2d 103, 120; see also *People v. Stewart* (1984), 105 Ill. 2d 22, 65.

We cannot discern, and defendant has failed to demonstrate, how he was prejudiced by the late disclosure. Although he suggests that he might have subjected the items to scientific examination if he had access to them at any earlier date, the record reveals that he declined the court's offer to allow him to submit any of the evidence to scientific examination. Further, defendant's vague reference to using the evidence for other purposes is insufficient to substantiate a claim of prejudice. Such a claim cannot be based on mere conjecture. (*People v. Lewis* (1975), 60 Ill. 2d 152, 158.) We conclude, therefore, that the late disclosure was, at most, a violation of Rule 412 which was harmless under the circumstances of this case.

We consider next defendant's argument that the trial court improperly allowed a psychiatrist, Dr. William Fowler, who testified as a rebuttal witness for the prosecution, to render his opinion that defendant was hospitalized for 15 years in mental institutions for a treatable personality disorder rather than a mental disease. The defendant maintains that this testimony was inappro-

priate in light of the fact that Dr. Fowler admitted that he had not considered the reports prepared during the 15-year period of hospitalization or discussed the hospitalization with the treating psychiatrists.

While defendant objected to this testimony at trial, he failed to reassert the issue in his motion for a new trial. Thus the issue is properly deemed waived. (*People v. Thurman* (1984), 104 Ill. 2d 326, 329; *People v. Caballero* (1984), 102 Ill. 2d 23, 31.) Because the issue of defendant's mental state is crucial to the case, however, we will respond to this argument.

On direct examination Dr. Fowler testified that it was his opinion that defendant did not suffer from a mental disease at the time of the offense. It was also his opinion that defendant had never suffered from a mental illness . or defect. This opinion was based on his study of police reports, the transcript of the taped confession, materials from previous incarcerations and a two-hour interview with the defendant.

On cross-examination, defense counsel asked Dr. Fowler if he had considered the records from defendant's mental institutionalizations when forming his opinion. Dr. Fowler responded that he was aware of the 15 years of hospitalization but had not considered the reports prepared during that period. Defense counsel then asked the doctor if a person can be institutionalized in Illinois without suffering from a mental disease. The doctor replied that he had seen it happen many times. On redirect examination the doctor was asked how defendant could have been held in a mental institution for 15 years if he was not suffering from a mental disease. The doctor answered, over defense counsel's objection, that it is not unusual for hospitals to institutionalize people—especially young people—for personality disorders. This is especially prevalent where the individual responds to his frustrations with antisocial behavior.

We find that Dr. Fowler's testimony was fully admissible pursuant to the rule articulated in *Wilson v. Clark* (1981), 84 Ill. 2d 186, *cert. denied* (1981), 454 U.S. 836, 70 L. Ed. 2d 117, 102 S. Ct. 140. There, the court adopted Rules 703 and 705 of the Federal Rules of Evidence. Rule 703 allows expert testimony not based on facts in evidence, as long as the facts are customarily relied on by experts in the field to form opinions. (Fed. R. Evid. 703.) We find that Dr. Fowler's examination of defendant, as well as his review of the other materials, provided a sufficient factual basis to form an opinion regarding the reason for defendant's past institutionalization. Further, the jury was aware of the basis for the doctor's testimony. The credibility and weight to be given this psychiatric testimony were for the trier of fact. *People v. Bilyew* (1978), 73 Ill. 2d 294, 302.

Defendant has raised three other issues, in addition to those already considered, which he did not raise in his post-trial motion. Two of these issues were not objected to at trial. He now maintains that the trial court erred in allowing the jury to consider color photographs of the decedent and her daughter. He further argues that the prosecution made improper remarks during closing argument and that the trial court erred in accepting a stipulation that the statutory aggravating factor was proved beyond a reasonable doubt without ascertaining whether the defendant knowingly and voluntarily agreed to the stipulation.

As we have already stated, issues not properly raised in a post-trial motion are considered waived. (*People v. Thurman* (1984), 104 Ill. 2d 326, 329; *People v. Caballero* (1984), 102 Ill. 2d 23, 31.) We view with concern the frequently occurring failure of attorneys to specifically detail the grounds for relief in written motions for a new trial so that the trial judge may, if need be, rectify any claimed error. As the court in *Caballero* observed, the

failure to do so leaves an appeal open-ended. While the waiver doctrine is not absolute, our Rule 615(a) sets out the exception to the waiver rule as follows:

"Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded. Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." (87 Ill. 2d R. 615(a).)

We have reviewed the three additional issues not raised in the post-trial motion and conclude that we are not presented with a situation involving plain error and mandating circumvention of the waiver rule. (See *People v. Carlson* (1980), 79 Ill. 2d 564, 576; *People v. Owens* (1984), 102 Ill. 2d 88, 104, *cert. denied* (1984), 469 U.S. 963, 83 L. Ed. 2d 297, 105 S. Ct. 362; see also *People v. Yates* (1983), 98 Ill. 2d 502, 533, *cert. denied* (1984), 466 U.S. 981, 80 L. Ed. 2d 836, 104 S. Ct. 2364, wherein the court specifically discusses the plain error rule in relationship to prosecutorial statements during closing argument.) These issues were, therefore, waived.

The defendant raises two issues with regard to the *voir dire* procedures followed at his trial. He objects generally to the qualification of prospective jurors pursuant to *Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770. He argues that this procedure deprives him of his right to a fair and impartial fact finder. The argument that qualifying a jury pursuant to *Witherspoon* predisposes a jury to believe in the defendant's guilt and denies him a fair and impartial jury has repeatedly been rejected by this court. See, *e.g., People v. Collins* (1985), 106 Ill. 2d 237, 278-79; *People v. Del Vecchio* (1985), 105 Ill. 2d 414, 429-30; *People v. Albanese* (1984), 104 Ill. 2d 504, 523; *People v. Holman* (1984), 103 Ill. 2d 133, 152-53, *cert. denied* (1985), 471 U.S. 1050, 85 L. Ed. 2d 342, 105 S. Ct. 1204; *People v. Caballero* (1984), 102 Ill. 2d 23, 45.

Moreover, the cases of *Keeten v. Garrison* (W.D.N.C. 1984), 578 F. Supp. 1164, and *Grigsby v. Mabry* (E.D. Ark. 1983), 569 F. Supp. 1273, cited by defendant in support of his position, do not persuade. *Keeten* was reversed on appeal, holding that the qualification of prospective jurors according to the dictates of *Witherspoon* does not produce a conviction-prone jury. (*Keeten v. Garrison* (4th Cir. 1984), 742 F.2d 129, 134.) Although the *Grigsby* decision, which held that a death qualified jury was conviction-prone, has been affirmed on appeal (*Grigsby v. Mabry* (8th Cir. 1985), 758 F.2d 226), this court considered that opinion in *People v. Collins* (1985), 106 Ill. 2d 237, and concluded that *Grigsby* could not be reconciled with the Supreme Court's recent clarification of *Witherspoon* in *Wainwright v. Witt* (1985), 469 U.S. 412, 83 L. Ed. 2d 841, 105 S. Ct. 844.

In *Wainwright v. Witt,* the court made it clear that the proper standard to apply when questioning a prospective capital juror is "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " (469 U.S. 412, 424, 83 L. Ed. 2d 841, 851-52, 105 S. Ct. 844, 852.) This is a lesser standard than the standard expressed in footnote 21 of *Witherspoon*, which seemingly excused jurors only when they would automatically reject the death penalty, without regard to the evidence. (See *Witherspoon v. Illinois* (1968), 391 U.S. 510, 522, n.21, 20 L. Ed. 2d 776, 785 n.21, 88 S. Ct. 1770, 1777, n.21.) As such, the court in *People v. Collins* concluded that the Supreme Court, aware of the *Grigsby* lower court decision and the *Keeten* circuit court decision, would not "be clarifying the standard for determining when a juror may be excused for cause and choosing a lesser standard than some lower courts have been applying if the actual exclusion of the juror would result in the defendant being de-

nied his constitutional rights." (*People v. Collins* (1985), 106 Ill. 2d 237, 279.) For the reasons stated in *People v. Collins* and our earlier cases previously cited, we adhere to our view that a jury qualified pursuant to the principles articulated in *Witherspoon* does not deny the defendant his constitutional right to a fair and impartial jury. U.S. Const., amends. VI, XIV.

Defendant also argues that the trial court improperly allowed prospective jurors to be asked whether they would be able to impose the death penalty in this case "under an assumed set of circumstances." An example of the type of questioning complained of by defendant is as follows:

> "And again, if you first find the defendant guilty of murder and we move on to the second phase of the trial and if, after hearing all of the evidence, being instructed as to the law by the Judge, going into the jury room and deliberating as a body, if you find that the death penalty should be imposed in this case, can you come back, again, and impose that penalty ***?"

Defendant characterizes such questioning as asking a prospective juror how he would decide the case on an assumed set of facts. Defendant cites *People v. Robinson* (1921), 299 Ill. 617, as persuasive authority in finding this type of questioning improper. (See also 87 Ill. 2d R. 234, Committee Comments.) Defendant also relies on *City of Quincy v. V. E. Best Plumbing & Heating Supply Co.* (1959), 17 Ill. 2d 570, and *Jahnke v. State* (Wyo. 1984), 682 P.2d 991.

We find the facts of *Robinson, City of Quincy, Jahnke* distinguishable from those presented in the instant case, and thus their holdings do not control. For example, in *Robinson* the defendant was indicted for obtaining money by means of a confidence game. During *voir dire* prospective jurors were asked questions such as:

" 'The prosecuting witness may appear to be an elderly white lady who may have parted with various sums of money, and it may develop that this defendant received this money and that she had not received any part of the money back, and she entered into an obligation with this defendant by which she expected to receive large returns for the money that she advanced, and if you are satisfied that this defendant did receive this money, but the criminal intent to defraud her by making representations that are false, and he had knowledge of the falsity,—if the State fails to show that this is the truth, would you by your verdict find this defendant not guilty?' " (*People v. Robinson* (1921), 299 Ill. 617, 618-19.)

In *City of Quincy,* a condemnation proceeding, the property owner's attorney was erroneously allowed to ask prospective jurors if they were aware that "payment of the bonds voted to defray the cost of acquiring the property would be paid from parking meter revenues, pledged to pay these bonds." (*City of Quincy v. V. E. Best Plumbing & Heating Supply Co.* (1959), 17 Ill. 2d 570, 575.) In *Jahnke,* a teenaged defendant charged with the murder of his father had allegedly suffered years of physical abuse. Defense counsel requested permission to ask prospective jurors, with respect to his theory of self-defense, questions relating to discipline of children which could be perceived as abusive. In upholding the trial court's denial of the request, the Wyoming Supreme Court held that "[t]he questions *** were not designed to reveal any hidden bias or prejudice *** [but were] requests to obtain the reaction of potential jurors to the appellant's theory of defense in the case and to anticipated evidence." *Jahnke v. State* (Wyo. 1984), 682 P.2d 991, 1000.

It is clear that the questioning involved in these cases was calling for the potential juror's attitudes based on specific sets of facts. The same cannot be said for the questioning objected to in the instant case. Here, the

State, in its attempt to discern the potential jurors' attitudes to the death penalty inquired if they would be able to impose the death penalty if such a sentence was supported by the law and facts. We find such questioning appropriate under *Witherspoon* and *Wainwright v. Witt*. As such, the trial court did not abuse its discretion in allowing the questions.

Next, defendant raises several issues with respect to the death sentence. He asserts that the death penalty statute (Ill. Rev. Stat. 1983, ch. 38, par. 9—1) is unconstitutional and also contends that imposition of the death penalty was excessive because the crimes were committed while he was under extreme mental and emotional distress. In addition, he argues that the trial court erred because it considered irrelevant factors in aggravation and considered other extraneous matters in imposing sentence.

Initially we consider defendant's arguments pertaining to the constitutionality of the death penalty statute. Defendant first argues that the death penalty statute is unconstitutional because it does not require the State to prove beyond a reasonable doubt the absence of mitigating factors sufficient to preclude the imposition of the death penalty. This argument is without merit. The same argument has been rejected on several occasions. (See, *e.g., People v. Perez* (1985), 108 Ill. 2d 70, 96; *People v. Madej* (1985), 106 Ill. 2d 201, 211; *People v. Eddmonds* (1984), 101 Ill. 2d 44, 68. See also *People v. Brownell* (1980), 79 Ill. 2d 508, 537-38.) We continue to adhere to the holding in those cases.

Defendant also contends that the discretion vested in the State's Attorney to decide whether to seek the death penalty is an unconstitutional delegation of legislative and judicial authority. We previously considered this same argument and rejected it. (*People v. Perez* (1985), 108 Ill. 2d 70, 96; *People v. Madej* (1985), 106 Ill. 2d 201,

211; *People v. Owens* (1984), 102 Ill. 2d 88, 114; *People v. Brownell* (1980), 79 Ill. 2d 508, 527; *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, 540-43, *cert. denied* (1980), 445 U.S. 953, 63 L. Ed. 2d 788, 100 S. Ct. 1603.) We decline to reconsider our previous holding with respect to this issue.

Defendant claims that the failure of our death penalty statute to require a presentence report for his nonjury death penalty hearing denied him due process of law. He points out that the presentence report filed for the subsequent sentencing hearing on the related offenses revealed that he had undergone prolonged drug treatment for a nervous condition and had contemplated suicide shortly after the offenses. Because the death penalty statute does not require a presentence report for the death penalty hearing, the court was unable to consider these factors prior to imposing the sentence of death.

This court has held that a presentence investigation report for judge-conducted death penalty hearings is not required. (*People v. Madej* (1985), 106 Ill. 2d 201, 211-12; see also *People v. Gaines* (1981), 88 Ill. 2d 342, 372-74, *cert. denied* (1982), 456 U.S. 1001, 73 L. Ed. 2d 1295, 102 S. Ct. 2285.) As in *Madej*, the sentencing judge in the instant case presided at both the guilt and the sentencing phases and was aware of all evidence with respect to defendant's background, social history and mental condition. Further, the evidence of defendant's drug treatment and attempted suicide was contained in reports available at the time of the hearing in aggravation and mitigation and could have been presented by defense counsel. Our study of the record persuades us, therefore, that the purpose of a presentence report (Ill. Rev. Stat. 1983, ch. 38, par. 1005—3—2(a)) was adequately fulfilled through the evidence presented at trial and during the sentencing hearing.

Defendant challenges the death penalty statute in

three other respects. He argues that the statute is unconstitutional because it does not provide for adequate appellate review to ensure that the death penalty is not arbitrarily imposed. He also maintains that our statute is unconstitutional because it does not provide a means to assure that all aggravating factors relied upon by the sentencing body are relevant or constitutionally permissible. Further, he contends that the death penalty statute is constitutionally infirm because it does not require the sentencing body to find that death is an appropriate penalty and requires the defendant to prove it is inappropriate once he is found eligible for a death sentence.

These three issues are not argued in the defendant's brief. Instead, the brief states that "in the interest of judicial economy, for the reasons set forth in appellant's brief in *People v. Bean,* (Docket No. 56448) *** [and] *People v. Hope,* docket no. 58037" the sentence of death should be vacated. The same three arguments were raised in *People v. Perez* (1985), 108 Ill. 2d 70, in the same manner. There we advised that this was an inappropriate manner in which to raise an issue before this court. Subsequent to the filing of *Perez,* and after oral argument in the instant case, defendant moved for leave to file a supplemental brief to comply with our admonition in *Perez.* That motion was denied. Moreover, in *Perez* this court considered and expressly rejected these three arguments. (*People v. Perez* (1985), 108 Ill. 2d 70, 96-98.) There is no need for further consideration of these issues here.

Defendant also argues that the trial court erred in considering irrelevant aggravation and injecting other extraneous matters into the sentencing decision. Defendant refers specifically to an observation made by the court following his discussion of the aggravating and mitigating factors, where he stated:

> "I tried to consider the evidence in this case in the light of my sixteen years experience in the private practice of law, as an Assistant State's Attorney and as a State's Attorney and as a Judge, and comparing this to all other murder cases that I have had reason to be personally involved in in those capacities. I am of the opinion that this is the most heinous case of murder I have had personal contact with."

Defendant maintains not only that this was irrelevant aggravation, but also that it was later recanted during the sentencing on the companion offenses. There the court stated, "I can not say *as a matter of law* that the conduct here is heinous and brutal *within the terms of the statute.*" (Emphasis added.)

We find this argument totally without merit. The Illinois Constitution and decisions of the United States Supreme Court mandate "consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." (*Woodson v. North Carolina* (1976), 428 U.S. 280, 304, 49 L. Ed. 2d 944, 961, 96 S. Ct. 2978, 2991; see Ill. Const. 1970, art. I, sec. 11; *People v. Szabo* (1983), 94 Ill. 2d 327, 352.) The trial judge's comparison of the circumstances in this case with the facts and circumstances surrounding other cases he had been involved with in his many years as a practicing attorney and judge was an appropriate consideration, insuring "[r]ationality, consistency, and evenhandedness in the imposition of the death penalty." *People v. Szabo* (1983), 94 Ill. 2d 327, 352-53; *People v. Brownell* (1980), 79 Ill. 2d 508, 543, *cert. dismissed* (1980), 449 U.S. 811, 66 L. Ed. 2d 14, 101 S. Ct. 59.

Moreover, defendant has mischaracterized the trial court's statement when sentencing the defendant on the companion offenses. There, the trial court judge was

considering whether the requirements of the extended-term-sentencing statute had been met and concluded that "the legislature intended that there be something more than the heinousness and brutality that must by definition accompany a particular offense to warrant an extended term because of the heinous and brutal conduct." Thus, the judge was not recanting his earlier statement during the death penalty proceeding. Rather, he had concluded that the requirements of the extended-term statute had not been met.

Nor do we find merit in defendant's contention that the court improperly commented on the integrity and efficiency of the Mattoon police department or the composure of the State's Attorney and friends and relatives of the victim, in light of the emotional nature of the trial. These comments were made subsequent to the return of the verdict and clearly were not factors considered in the imposition of the death penalty.

Defendant maintains that the trial court erred in refusing to consider sympathy for the defendant as a mitigating factor. The report of proceedings at the imposition of the death penalty reveals the following. Prior to the imposition of the death penalty, the court made several observations, including the fact that after hearing all the evidence one could not help but feel "sympathy for the pathetic creature, Patrick Wright." The court went on to say that sympathy for defendant was not an appropriate consideration. The court also noted that a statement made by defendant to the media after the jury returned its verdict, wherein he expressed a desire to be sentenced to death, was not considered in the court's determination. Finally the court stated:

> "To repeat in part, any matters dealing with sympathy, outrage, who the victim was, all the matters I just mentioned have no bearing on whether the defendant shall receive the death penalty. And again, I note for the

record that I have cited them so the record is clear that I have rejected them, and I have disregarded them in making my decision."

We do not find error in the trial court's refusal to consider sympathy in its sentencing deliberation. As the Supreme Court has recognized, "[i]t is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion." (*Gardner v. Florida* (1977), 430 U.S. 349, 358, 51 L. Ed. 2d 393, 402, 97 S. Ct. 1197, 1204; see also *People v. Holman* (1984), 103 Ill. 2d 133, 163; *People v. Szabo* (1983), 94 Ill. 2d 327, 352-53.) In *People v. Stewart* (1984), 104 Ill. 2d 463, the defendant argued that it was error for the jury to be instructed that sympathy should not be considered in its deliberation on whether to impose the death penalty. While recognizing that some jurisdictions have held it to be error to tender such an instruction, the court in *Stewart* found that the preferred view was that such an instruction was not improper. (104 Ill. 2d 463, 494; see also *People v. Perez* (1985), 108 Ill. 2d 70, 91-92.) In like manner, we find that the trial court's refusal to consider sympathy in its deliberation, in the instant case, was proper.

In a related argument, defendant contends that the trial court erred in failing to consider several mitigating factors in imposing the death sentence. Specifically defendant asserts that the trial court failed to consider his expression of remorse, his cooperation with the police and his confession to the crimes, his limited prior record with no history of violent offenses, his potential for rehabilitation, and his severely troubled youth as mitigating factors. The defendant asserts that the trial court did not weigh these factors in imposing sentence, and that the case must therefore be remanded for resentencing.

We disagree with defendant's argument that the trial court erred by failing to consider defendant's confession to the crimes, his expression of remorse and his potential for rehabilitation as mitigating factors. The record shows that the court expressly found that these factors were not supported by the evidence. As to defendant's contention that his confession and statement that he was sorry for the murder should be considered in mitigation, the court concluded otherwise, stating:

> "This Court, having heard the testimony, is of the opinion that the defendant, Mr. Wright, enjoyed what he did, found pleasure in relating his tale of rampant violence and has little or no remorse for his behavior. Having heard the tape and the testimony, I formed the opinion and I continue to have the opinion that the defendant is a man who tasted blood, enjoyed it and is likely to return for more if society ever grants him the opportunity."

We find substantial support in the record for the trial court's finding that defendant had "little or no remorse for his behavior." With regard to defendant's rehabilitative potential, the court determined that defendant would "carry with him for his life his personality disorder; that other than possible experimental treatment, his condition [was] without hope." The trial court's finding is supported by ample evidence, including the testimony of defendant's own psychiatric expert, Dr. Arthur Traugott, and the report of the State's psychiatrist, Dr. William Fowler. Indeed, defense counsel at the sentencing hearing argued:

> "He can't be rehabilitated. Twenty-five years in institutions have proven he can't be rehabilitated. He doesn't belong in civilized society. I'm not going to stand up here and say anything different. I think it would insult the intelligence of this Court if I said anything different. He should never be a free man. He should never walk among civilized people again. But he shouldn't be put to death."

We also disagree with defendant's contention that the

trial court should have considered his prior criminal record as a mitigating factor. Defendant characterizes his prior criminal record as a "limited" one, with "no history of violent offenses." In contrast, the trial court found that defendant had "a significant history of prior criminal activity." The record shows that defendant had criminal convictions for theft, burglary, criminal damage to property, and armed violence. We believe the record justifies the trial court's finding that defendant had a significant history of prior criminal activity. See *People v. Madej* (1985), 106 Ill. 2d 201, 221.

Lastly we address defendant's contention that the trial court failed to consider evidence of defendant's traumatic youth in mitigation. Defendant's argument is premised on *Eddings v. Oklahoma* (1982), 455 U.S. 104, 71 L. Ed. 2d 1, 102 S. Ct. 869, wherein the Supreme Court concluded that evidence of a defendant's troubled youth is a relevant mitigating factor when determining whether or not to impose the death sentence. In *Eddings*, the defendant was convicted of murder and sentenced to death. During the sentencing hearing the defendant presented substantial evidence of his troubled youth, including evidence that he had been subjected to beatings by his father; evidence that his mother was an alcoholic and possibly a prostitute; and evidence of his severe emotional disturbance. The sentencing judge, however, refused to consider the evidence of the defendant's troubled youth in mitigation. The Supreme Court reversed, holding that the sentencing judge's refusal to consider the defendant's traumatic youth in mitigation violated the eighth and fourteenth amendments to the Federal Constitution.

In the present case, defendant introduced at trial substantial evidence of his traumatic youth. The evidence adduced at trial revealed that prior to being adopted at age four, defendant was subjected to excessive physical

punishment and abuse by his natural mother; that he had suffered from a psychosexual disorder involving shoe fetishism since age seven; and that he was spurned and physically abused by his adoptive mother because of his psychosexual disorder. The record indicates that defendant was involved repeatedly in criminal activity as a youth because of his psychosexual disorder, and, as a result, was institutionalized in juvenile homes and reform schools on several occasions beginning at age 13. Defendant's troubled childhood also included institutionalization in mental hospitals beginning at age 15.

The record further shows that the trial court considered the evidence of defendant's traumatic youth in determining that there were no mitigating factors sufficient to preclude the imposition of the death sentence. It is well established that this court "will require that consideration be given to any mitigating facts in the record of the trial [citation] as well as any which the defendant offers at the sentencing hearing." (*People v. Lewis* (1981), 88 Ill. 2d 129, 144. See also *People v. Carlson* (1980), 79 Ill. 2d 564, 589-90.) Moreover, the State specifically requested that the court, in imposing sentence, "consider all of the evidence presented during the trial." Thereafter, the following colloquy occurred:

"THE COURT: I should perhaps ask, *** [defense counsel], do you have any objection to my reconsidering the evidence that was adduced at trial?

[DEFENSE COUNSEL]: Judge, I don't know that it *** would be a proper objection even if I made it, but I'm not making it. I have no problem.

THE COURT: Very well. I will consider that evidence also."

Therefore, we conclude that the court considered all potential mitigating facts in the record, including those adduced at trial.

In imposing sentence, the court concluded that it

could find only one mitigating factor: the fact that the murder was committed "while the defendant was under the influence of extreme mental *** disturbance, although not such as to constitute a defense to prosecution." (Ill. Rev. Stat. 1983, ch. 38, pars. 9—1(c)(2), (h)). This indicates that the court did consider the defendant's troubled youth and its contribution, if any, to the mental disturbance existing at the time that the crime was committed. The court found, however, that this mental disturbance was insufficient to preclude the death sentence. We conclude, therefore, that the trial court's sentencing determination did comport with the holding of *Eddings v. Oklahoma* (1982), 455 U.S. 104, 71 L. Ed. 2d 1, 102 S. Ct. 869.

For the reasons stated, we affirm the judgment of conviction and sentence of death of the circuit court of Coles County. The clerk of this court is directed to enter an order setting Wednesday, March 19, 1986, as the date on which the sentence of death, entered in the circuit court of Coles County, is to be carried out. The defendant shall be executed by lethal injection in the manner provided by section 119—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1983, ch. 38, par. 119—5). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution wherein defendant is confined.

*Judgment affirmed.*

CHIEF JUSTICE CLARK, concurring in part and dissenting in part:

The majority finds that the sentencing judge considered evidence of the defendant's traumatic youth as a relevant mitigating factor and therefore complied with the mandate of *Eddings v. Oklahoma* (1982), 455 U.S.

104, 71 L. Ed. 2d 1, 102 S. Ct. 869. (111 Ill. 2d at 167.) The record simply does not sustain this conclusion.

The majority observes that the trial court, when imposing the sentence, concluded that only *one* mitigating factor existed that could be balanced against the aggravating factors present: the fact that the defendant was under extreme mental distress at the time of the offense. (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(c)(2).) It defies all logic to assume, as the majority does here, that inasmuch as the sentencing judge considered the mental distress the defendant was under *at the time of the offense,* it also follows that the judge considered the defendant's traumatic youth in mitigation "and its contribution, if any, to the mental disturbance existing at the time that the crime was committed." (111 Ill. 2d at 168.) The record is conspicuously void of any objective evidence to support the majority's assumption, which I find particularly egregious since the defendant's life literally hangs in balance upon its error.

The majority apparently sees fit to second-guess the mental processes of the sentencing judge. It should be noted that in determining that no other mitigating factors existed, the sentencing judge stated for the record:

> "The Court has given great consideration to whether other mitigating factors exist. This Court is unable to determine the existence of any mitigating factors within or without the statute with the exception [of defendant's extreme mental distress at the time of the offense] that I have noted."

From this statement, it is clear that the sentencing judge did not consider in mitigation the substantial evidence of the defendant's troubled youth. I conclude, therefore, that the sentencing determination violated the constitutional standards of *Eddings v. Oklahoma* (1982), 455 U.S. 104, 71 L. Ed. 2d 1, 102 S. Ct. 869. For this reason, I would vacate the defendant's sentence of death

and remand the cause for a new sentencing hearing.

JUSTICE SIMON, dissenting:

I join in the dissenting portion of Chief Justice Clark's separate opinion. For the reasons explained below, I would also reverse defendant's convictions and remand this cause for a new trial. In addition, for the reasons set forth in my separate opinions in *People v. Lewis* (1981), 88 Ill. 2d 129, 179 (Simon, J., dissenting), in *People v. Silagy* (1984), 101 Ill. 2d 147, 184 (Simon, J., concurring in part and dissenting in part), and in *People v. Albanese* (1984), 104 Ill. 2d 504, 549 (Simon, J., concurring in part and dissenting in part), I believe that the Illinois death penalty statute is unconstitutional and that the death sentence in this case should be vacated.

Defendant was convicted by a jury which had been "death-qualified," that is, which was screened to exclude prospective jurors who stated that they could not vote for a death sentence. No jurors were actually excluded for cause on this ground in defendant's case, but he maintains that the prejudice to him did not depend on the fact of exclusion but on the questioning process itself. According to defendant, the process of questioning jurors on their views on the death penalty alters their attitudes as to an accused's guilt and distorts their consideration of the facts at the guilt phase of his trial, thus predisposing the jury to convict him. This argument was rejected in passing in *People v. Albanese* (1984), 104 Ill. 2d 504, 523, and the majority here does not further address it; instead it holds broadly that death-qualifying does not in any way produce a jury which is conviction prone or otherwise violative of constitutional guarantees.

In my view, the process of death-qualifying a jury predisposes jurors to convict the defendant and thus denies him an impartial jury even when no jurors are actually excluded. For this reason, I would reverse and re-

mand for a new trial. In addition, I disagree with the majority's broad conclusion and believe that excluding for cause prospective jurors who hold scruples against the death penalty from the *guilt* phase of trial violates the defendant's sixth amendment right to a jury drawn from a fair cross-section of the community.

I note that, on this latter point, the position set forth in this dissent differs from that expressed in the opinion I wrote in *People v. Holman* (1984), 103 Ill. 2d 133, 152-53. That case was decided prior to the Eighth Circuit's decision in *Grigsby v. Mabry* (8th Cir. 1985) (*en banc*), 758 F.2d 226. After reading that well-reasoned opinion, I have changed my views on the propriety of death-qualifying a jury prior to the guilt phase of trial, particularly where, as in this case, the only function of the jury is to decide on the defendant's guilt, and the death sentence is imposed by the judge rather than the jury.

THE PROCESS OF QUESTIONING PROSPECTIVE JURORS AS TO THEIR DEATH PENALTY SCRUPLES PRODUCES A JURY PREDISPOSED TO CONVICT IRRESPECTIVE OF WHETHER ANY JUROR IS ACTUALLY EXCLUDED.

It is fundamental in our system that persons accused of serious crimes are entitled to trial by an impartial jury. (See, *e.g., Ristaino v. Ross* (1976), 424 U.S. 589, 47 L. Ed. 2d 258, 96 S. Ct. 1017.) There can be no dispute that a jury which is predisposed to convict the accused is not impartial. Thus, the only question raised by defendant's contention is whether the process of questioning the prospective jurors in *voir dire* as to their death penalty scruples in fact results in a jury which is predisposed to convict.

At *voir dire* preceding defendant's trial, prospective jurors were questioned at length by the court and counsel for the parties as to their attitudes on the death penalty and whether they could, in proper circumstances,

vote to impose it. The jurors heard not only the questions asked of them, but also those asked of other prospective jurors in the same panel of four. Recent scientific data strongly suggests that this death-qualifying process itself has a biasing effect on the jurors' determination of an accused's guilt. (See Haney, *On The Selection of Capital Juries: The Biasing Effects of The Death Qualification Process*, 8 Law and Human Behavior, Nos. 1/2, at 121 (1984).) In the Haney study, one group of subjects saw a videotape of a realistic *voir dire* proceeding including death-qualification. The other group saw the same *voir dire* but with all death-qualification questions deleted. Both groups then responded to a questionnaire concerning what they had seen. The results were striking; those who had seen the death-qualification were more likely to believe the accused was guilty and more inclined to believe that the prosecutor, judge, and even the defense attorney thought that the defendant was guilty.

To date two courts have adopted the findings of the Haney study. In *Grigsby v. Mabry* (E.D. Ark. 1983), 569 F. Supp. 1273, 1304, *aff'd on other grounds* (8th Cir. 1985) (*en banc*), 758 F.2d 226, the court exhaustively analyzed the evidence and concluded that "independently of the compositional effects of the *voir dire*, and in addition thereto, the process itself increases the likelihood that the jury which ultimately sits will be more likely to convict ***."

In *Hovey v. Superior Court* (1980), 28 Cal. 3d 1, 71, 616 P.2d 1301, 1348, 168 Cal. Rptr. 128, 175, the California Supreme Court said:

> "Jurors undergoing death-qualification would have reason to infer that the judge and the attorneys personally believe the accused to be guilty or expect the jury to come to that conclusion. Only such an inference could serve to explain to the jurors why so much time and energy are

devoted to an extensive discussion of penalty before trial. Provided with these cues from people who are not only experts in the courtroom but are also presumably acquainted with all the evidence in the case, the relevant law, and the 'correct' application of the one to the other, death-qualified jurors may themselves become more inclined to believe that the accused is guilty as charged."

In *Hovey* the court also noted that jurors who are predisposed to convict by the death-qualifying process will tend to selectively perceive evidence, draw only those inferences which support their preconceptions, and evaluate the evidence in a manner which fulfills their expectations. (28 Cal. 3d 1, 71-72, 616 P.2d 1301, 1348, 168 Cal. Rptr. 175-76.) Although that court did not ban death-qualification altogether, it did order that the prejudice inherent in the current procedures be minimized by conducting the death-qualification of each juror out of the presence of all other actual or prospective jurors, a procedure this court noted with approval was employed in *People v. Albanese* (1984), 104 Ill. 2d 504, 524.

The available evidence suggests that, as defendant contends, the death-qualifying process predisposed the jury to convict and altered the jurors' ability to fairly evaluate the evidence at trial. The jurors were led to believe that the primary issue which they were to be called upon to resolve in the case was whether the death penalty was to be imposed. (*Grigsby v. Mabry* (E.D. Ark. 1983), 569 F. Supp. 1273, 1303.) I believe that defendant was thus denied an impartial jury, and his convictions should therefore be reversed.

EXCLUSION FOR CAUSE OF PROSPECTIVE JURORS FROM THE GUILT PHASE OF TRIAL BASED UPON THEIR DEATH PENALTY SCRUPLES VIOLATES AN ACCUSED'S RIGHT TO A JURY FROM A FAIR CROSS-SECTION OF THE COMMUNITY.

In *Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L.

Ed. 2d 776, 88 S. Ct. 1770, the Supreme Court held that due process prevented the wholesale exclusion of all persons who expressed objections to the death penalty from capital sentencing juries; in reaching this conclusion, the court established narrow guidelines for excluding those who could never vote for the death penalty. But the *Witherspoon* court expressly refused to decide the question addressed by the majority here: whether excluding jurors from the guilt-determination phase of trial based on their death penalty scruples results in a conviction-prone jury and thus violates the defendant's fair–cross-section right.

As the majority observes, the Federal courts of appeals have split on this issue. (See, *e.g., Grigsby v. Mabry* (8th Cir. 1985) (*en banc*), 758 F.2d 226; *Keeten v. Garrison* (4th Cir. 1984), 742 F.2d 129; *Spinkellink v. Wainwright* (5th Cir. 1978), 578 F.2d 582.) However, in my view, the Eighth Circuit's recent decision in *Grigsby v. Mabry* (8th Cir. 1985) (*en banc*), 758 F.2d 226, is not only the most persuasive analysis of the issue, but also the most consistent with *Witherspoon* and its progeny.

In *Grigsby*, the court applied the three-pronged analysis of *Duren v. Missouri* (1979), 439 U.S. 357, 364, 58 L. Ed. 2d 579, 587, 99 S. Ct. 664, 668, to establish that excluding jurors from the guilt phase of a trial because of their opposition to the death penalty constituted a *prima facie* violation of the fair–cross-section requirement. As the court noted, *Witherspoon* itself is direct authority for the proposition that persons with scruples against the death penalty are a distinctive group in the community, thus satisfying the first prong of *Duren*. Indeed, the evidence showed that between 11% and 17% of those eligible for jury service were excludable on this basis. Second, the court found that the complete lack of representation of this group on guilt-determination juries was not fair and reasonable considering the number of

such persons in the community. Third, *Grigsby* noted that such underrepresentation was due to the systematic exclusion which results from the death-qualifying process.

The heart of *Grigsby*, however, is its analysis of the question which the Supreme Court left open in *Witherspoon* because of the "tentative and fragmentary" (*Witherspoon v. Illinois* (1968), 391 U.S. 510, 517, 20 L. Ed. 2d 776, 782, 88 S. Ct. 1770, 1774) nature of the evidence at that time: whether death-qualified juries are *in fact* conviction prone and thus unrepresentative of the community.

The evidence considered by the *Grigsby* court was impressive in its clarity and consistency. More than a dozen carefully constructed scientific studies of juror attitudes and voting behavior, most conducted since *Witherspoon*, demonstrated that those who support the death penalty are far more likely than opponents (i) to vote for conviction and (ii) to hold pro-prosecution attitudes on a range of criminal justice issues. (*Grigsby v. Mabry* (8th Cir. 1985) (*en banc*), 758 F.2d 226, 232-35.) No scientific evidence to the contrary was presented. 758 F.2d 226, 236.

On the basis of this evidence, the Eighth Circuit found that "a capital jury, with WEs [*Witherspoon* excludables] stricken for cause, is in fact conviction prone and, therefore, does not constitute a cross-sectional representation in a given community." (758 F.2d 226, 229.) Conviction by such a jury can be reversed without a showing of actual prejudice. See, *e.g, Duren v. Missouri* (1979), 439 U.S. 357, 58 L. Ed. 2d 579, 99 S. Ct. 664.

The majority here summarily rejects *Grigsby* on the grounds that it cannot be squared with the Supreme Court's recent decision in *Wainwright v. Witt* (1985), 469 U.S. 412, 83 L. Ed. 2d 841, 105 S. Ct. 844. In essence, the majority argues that the court, "aware" of the evidence presented in *Grigsby*, would not be clarify-

ing the *Witherspoon* standard for excluding persons from sentencing juries if it planned on finding later that exclusion of jurors from the guilt phase of trial independently violates the defendant's sixth amendment rights. In my opinion it is unlikely that the court would have foreclosed a *Grigsby*-type challenge in a case in which no such issue was raised nor evidence presented. The majority's prediction is even less plausible given that *Witherspoon* recognized the issues as independent and invited the proof adduced in *Grigsby*. In fact, the majority's holding here confuses "two distinct responsibilities" of the jury: the determination of innocence or guilt and the determination of the proper sentence (*Witherspoon v. Illinois* (1968), 391 U.S. 510, 518, 20 L. Ed. 2d 776, 782, 88 S. Ct. 1770, 1775).

In *Witherspoon*, the court held that a death sentence could not be carried out if the jury that imposed it was chosen by excluding veniremen simply because they voiced some objection to the death penalty. The court there reserved the very different question of whether the "exclusion of jurors opposed to capital punishment results in an unrepresentative jury on the issue of guilt or substantially increases the risk of conviction." (391 U.S. 510, 518, 20 L. Ed. 2d 776, 782, 88 S. Ct. 1770, 1775.) The court suggested:

> "[A] defendant convicted by such a jury in some future case might still attempt to establish that the jury was less than neutral with respect to *guilt*. If he were to succeed in that effort, the question would then arise whether the State's interest in submitting the penalty issue to a jury capable of imposing capital punishment may be vindicated at the expense of the defendant's interest in a completely fair determination of guilt or innocence—given the possibility of accommodating both interests by means of a bifurcated trial, using one jury to decide guilt and another to fix punishment. \*\*\*" *Witherspoon v. Illinois* (1968), 391 U.S. 510, 520 n.18, 20 L. Ed. 2d 776, 784

n.18, 88 S. Ct. 1770, 1776 n.18.

Far from addressing the issue left open in *Witherspoon*, the court in *Wainwright v. Witt* simply "clarif[ied]" the test for excluding veniremen (469 U.S. 412, 424, 83 L. Ed. 2d 841, 851, 105 S. Ct. 844, 852) from "capital *sentencing* juries." (Emphasis added.) (469 U.S. 412, 424 n.5, 83 L. Ed. 2d 841, 852 n.5, 105 S. Ct. 844, 852 n.5.) Instead of, as the majority sees it, foreclosing all future attacks on any aspect of death-qualification, *Wainwright* merely "adhere[s] to the essential balance struck by the *Witherspoon* decision." (469 U.S. 412, 424 n.5, 83 L. Ed. 2d 841, 852 n.5, 105 S. Ct. 844, 852 n.5.) Thus, we may properly consider the evidence that death-qualified juries are conviction prone.

The majority correctly points out that several courts have considered and rejected a *Grigsby*-type challenge. However, the approach of these courts is based on a fundamental misconception of what the sixth amendment requires. The uniform mistake made by those rejecting the *Grigsby* analysis is the belief that what the defendant is asserting is a "right to *** a jury slanted in favor of guilty defendants" (*Rowan v. Owens* (7th Cir. 1984), 752 F.2d 1186, 1191; see also *Spinkellink v. Wainwright* (5th Cir. 1978), 578 F.2d 582, 594; *Keeten v. Garrison* (4th Cir. 1984), 742 F.2d 129, 134). The sixth amendment fair–cross-section issue accurately stated, however, "is not whether a jury would be biased one way or the other, but whether an impartial jury can exist when a distinct group in the community is excluded ***." *Grigsby v. Mabry* (8th Cir. 1985) (*en banc*), 758 F.2d 226, 241-42.

Nothing in the *Grigsby* analysis suggests that a venireman who states that, because of his death penalty scruples, he cannot fairly assess guilt or innocence may not be excluded from the guilt-determination phase as

well as the sentencing phase. Such a person would not be able to perform "his duties as a juror in accordance with his instructions and his oath." (*Adams v. Texas* (1980), 448 U.S. 38, 45, 65 L. Ed. 2d 581, 589, 100 S. Ct. 2521, 2526; *Wainwright v. Witt* (1985), 469 U.S. 412, 424 n.5, 83 L. Ed. 2d 841, 852 n.5, 105 S. Ct. 844, 852 n.5.) There is, however, no legitimate reason to exclude a juror who swears that he can carry out the law in determining guilt or innocence irrespective of his opposition to the death penalty. The process of excluding such jurors effectively silences a segment of the community which the sixth amendment mandates be permitted to participate.

ANY LEGITIMATE INTEREST IN CARRYING OUT THE CAPITAL SENTENCING SCHEME CAN BE ACHIEVED WITHOUT PREJUDICING AN ACCUSED'S RIGHTS TO AN IMPARTIAL JURY AND A JURY REPRESENTATIVE OF THE COMMUNITY.

The ostensible purpose of death-qualifying a jury is to vindicate the State's interest in administering its capital sentencing scheme. That interest can, however, be served without subjecting the defendant to trial at the guilt-determination phase by a conviction-prone jury. Perhaps an appropriate solution would be to use bifurcated juries or impanel sufficient alternate jurors to allow exclusion at the sentencing stage of those unable to vote for the death penalty. This would accommodate both the State interest and the defendant's sixth amendment rights.

This case starkly illustrates the need for such an accommodation. Here, as in many cases, a jury determined that the defendant was guilty but the sentence was imposed by the circuit judge acting without a jury. No legitimate State interest can in any event be served by death-qualifying a jury prior to trial if the jury is not called upon to consider sentencing options.

The practice of death-qualifying at *voir dire* is especially offensive given that the State's Attorney is not required to notify the defendant in advance of trial whether he will actually seek the death penalty if a conviction is obtained. (*People v. Brownell* (1980), 79 Ill. 2d 508, 525-27.) This lack of disclosure raises grave constitutional questions in its own right which I do not find it necessary to address fully here. Suffice it to say that the lurking menace of the death penalty may cause the defendant to make uninformed choices concerning his defense, such as allocating too few resources to the guilt phase and too much to establishing mitigation, or pleading guilty to avoid a death sentence when, in reality, the prosecutor has no intention of seeking the death penalty. The prejudice resulting from the prosecutor's silence on this question is only exacerbated by the procedure which this court permits and which, ironically, allows him to death-qualify the jury even if he does not intend to ask for the death penalty. Under the present practice, we simply cannot know whether the State's Attorney is death-qualifying for the clearly impermissible purpose of obtaining a predisposed or conviction-prone trier of guilt or innocence.