In the
United States Court of Appeals
For the Seventh Circuit

Nos. 01-3066 & 01-3157

Patrick Wright,

Petitioner-Appellee/
Cross-Appellant,

v.

Jonathan Walls,

Respondent-Appellant/
Cross-Appellee.

Appeals from the United States District Court
for the Central District of Illinois.
No. 93 C 2105--Harold A. Baker, Judge.

Argued February 26, 2002--Decided April 24, 2002

Before Flaum, Chief Judge, and Easterbrook
and Williams, Circuit Judges.

Flaum, Chief Judge.  A jury convicted
Patrick Wright of murder, attempted
murder, attempted rape, armed robbery,
home invasion and residential burglary.
The trial court sentenced him to death.
Following the exhaustion of all state
remedies, Wright petitioned for a writ of
habeas corpus alleging numerous
constitutional errors at both the trial
and sentencing phases. The district court
vacated Wright's death sentence because
the sentencing judge impermissibly failed
to consider mitigating evidence related
to Wright's traumatic childhood. The
district court also affirmed Wright's
conviction, holding that Wright did not
receive ineffective assistance of counsel
at trial./1 Both Wright and the State
of Illinois appeal. For the reasons
stated herein, we affirm.

I.  Background

On June 6, 1983, Wright entered Carol
Specht's apartment, put a knife to her
throat and attempted to rape her. After
binding and gagging Carol, Wright
proceeded through the rest of the
Spechts' home when he discovered Carol's
daughter, Connie. Wright forced Connie

into her mother's bedroom where he sexually abused her. Wright later slashed Connie's throat multiple times and stabbed Carol in the back. Connie survived, but Carol died./2 Wright was charged with murder, attempted murder, attempted rape, armed robbery, home invasion and residential burglary.

At trial, Wright's counsel did not contest the fact that Wright committed the crimes charged. Instead, trial counsel argued that Wright suffered from a mental disease involving a fetish for women's shoes. The sole evidence offered at trial supporting this theory was Wright's testimony that he had a women's shoe fetish, that he suffered from the fetish since the age of seven, that his adoptive mother beat him because of his mental impairment, and that he had been institutionalized in various mental hospitals since the age of 13. Wright also testified, contrary to his tapedconfession, that he had entered the Spechts' apartment seeking women's shoes for sexual gratification. Dr. William Fowler testified for the State in rebuttal. He stated that Wright did not suffer from a mental disease at the time of the offense, but rather suffered from a non-pathological psychosexual disorder. The trial court provided the jury with general verdict forms, including verdicts of not guilty, not guilty by reason of insanity, guilty but mentally ill ("GBMI"), and guilty for each of the offenses. The jury found Wright guilty of all the crimes charged.

Wright waived a sentencing jury. At the sentencing hearing, Wright offered the testimony of Dr. Arthur Traugott, who opined that although Wright was able to appreciate the wrongfulness of his acts, Wright's shoe fetish controlled his lifestyle and was the cause of prior incarceration and institutionalization. The sentencing judge ultimately imposed the death penalty. Before doing so, however, the sentencing judge commented extensively on the factors that he would-- and would not--consider in determining an appropriate sentence. Initially, the court focused on Wright's traumatic childhood, stating:

I don't think any reasonable person who has heard all of the evidence in this case can feel anything but sympathy for

the pathetic creature, Patrick Wright, who has been paraded through the courtroom in the trial of this case. He is a man who has wandered the forty wretched years of his life from institution to institution, from prison to prison; the evidence indicating that his fetish for women's shoes being perhaps the one and only purpose for his life.

After acknowledging Wright's "pathetic" history, the sentencing judge made three statements giving rise to the current appeal. First, the sentencing judge noted that "sympathy for the defendant [was] not an appropriate consideration" in determining Wright's sentence. Second, the judge listed all of the factors that he would exclude from the death penalty calculus:

To repeat in part, any matters dealing with sympathy, outrage, who the victim was, all the matters that I just mentioned have no bearing on whether the defendant shall receive the death penalty. And again, I note for the record that I have cited them so the record is clear that I have rejected them, and I have disregarded them in making my decision.

Third, in weighing the mitigating and aggravating circumstances according to Illinois law, the sentencing judge stated that he was unable to "determine the existence of any mitigating factors within or without the statute with the exception of [extreme mental emotional disturbance at the time of the crime.]"

Wright appealed his conviction and sentence directly to the Illinois Supreme Court. In his appeal, Wright raised eight separate issues, only one of which is relevant to this appeal. Wright argued that in imposing the death sentence, the sentencing court failed to consider all of the mitigating evidence presented by Wright, including evidence related to his troubled youth. The Illinois Supreme Court affirmed Wright's death sentence. The Court first acknowledged that lower courts must consider "any mitigating facts in the record of the trial as well as any which the defendant offers at the sentencing hearing." People v. Wright, 490 N.E.2d 640, 656 (Ill. 1985) ("Wright I") (citing People v. Lewis, 88 Ill. 2d

129, 144 (1981)). However, the Illinois Supreme Court ruled that the sentencer took account of all of the mitigating evidence because (1) the State specifically requested the court to consider all of the evidence presented during trial, and (2) the sentencing judge's comments that he found one mitigating factor--extreme emotional disturbance at the time of the crime-- indicated that he considered "the defendant's troubled youth and its contribution, if any, to the mental disturbance existing at the time the crime was committed." Id. at 656.

Following the exhaustion of all appeals and applications for post-conviction relief in state court,/3 Wright petitioned for a writ of habeas corpus based upon numerous arguments. The current appeal deals with two of them. Wright first claimed that the sentencer's comments during sentencing conveyed a misapprehension of the law that precluded him from considering evidence of Wright's traumatic childhood in mitigation. Wright also asserted that trial counsel was ineffective for failing to argue, investigate and introduce during the liability phase evidence of Wright's men tal health problems. Although counsel had investigated Wright's mental health history, Wright relied on approximately 50 pages of additional medical records obtained after trial that indicated limited intelligence, psychiatric drug use, and severe physical abuse by both his natural and adoptive parents.

The district court granted the writ with respect to Wright's death sentence, holding that the trial judge's failure to consider as mitigation Wright's traumatic childhood and mental health problems violated Eddings v. Oklahoma, 455 U.S. 104 (1982). The district court reasoned:

[T]he judge specifically stated that he could discern no mitigating factors except for [Wright's] extreme emotional disturbance at the time he committed the offense. But [Wright] presented evidence of a horrible childhood; surely that qualifies as mitigation. If the judge considered this evidence, as he was required to do, why would he say that no mitigating factors existed besides [Wright's] emotional disturbance at the time of the crime? Simply put, he would

not. He might find the mitigation of little weight, but he would not say that it did not exist. To derive any other meaning from his plain words requires tortuous reasoning.

Wright v. Cowan, 149 F. Supp. 2d 523, 537-38 (C.D. Ill. 2001).

The district court denied relief for Wright's ineffective assistance of counsel claim. Initially, the district court ruled that Wright had procedurally defaulted certain aspects of the claim for failing to raise it before the Illinois State courts. Specifically, the court noted that in his first petition for post-conviction relief, Wright did not argue that counsel was ineffective for focusing on Wright's alleged insanity, as opposed to pursuing a GBMI verdict. Because the Illinois Supreme Court held that Wright had waived the issue, and because that was an adequate and independent state ground, the district court limited its ineffectiveness inquiry to the issue of omitted evidence and did not address the wisdom of trial counsel's strategy to pursue exclusively an insanity defense. With these parameters in place, the district court held that although trial counsel was not perfect, Wright could not satisfy the rigorous standards of Strickland v. Washington, 466 U.S. 668 (1984). Wright, 149 F. Supp. 2d at 532-34. Both parties appeal.

II. Discussion

We note that the Antiterrorism and Effective Death Penalty Act ("AEDPA") does not apply in the present case because Wright filed his petition for a writ of habeas corpus prior to the AEDPA's effective date. See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Everett v. Barnett, 162 F.3d 498, 500 (7th Cir. 1998). Accordingly, we apply pre-AEDPA standards to this appeal: we presume correct the state court's determination of historical factual issues, see Porter v. Gramley, 112 F.3d 1308, 1316 (7th Cir. 1997), and we review de novo questions of law or mixed questions of law and fact considered by state courts. Shasteen v. Saver, 252 F.3d 929, 933 (7th Cir. 2001).

A. Vacation of Death Sentence

The first issue we must address is whether the district court properly vacated Wright's death sentence because the sentencing judge impermissibly refused to consider proposed mitigating evidence related to Wright's background. Wright argues that this ruling was correct because the sentencing court's comments unambiguously reveal that he could discern no mitigating factor beyond Wright's extreme emotional disturbance at the time of the crime. According to Wright, this necessarily means that the sentencing judge did not consider Wright's traumatic history. In response, the State maintains that although the judge had to entertain Wright's traumatic background, he was not required to grant that evidence any amount of weight. The State interprets the sentencing court's remarks as considering but rejecting Wright's mitigating evidence.

Both parties agree that Eddings v. Oklahoma, 455 U.S. 104 (1982), and its progeny provide the governing legal principles in this case. In Eddings, the Supreme Court held that because imposition of a death sentence demandsindividualized consideration of each defendant's circumstances, the sentencing court must admit and consider all relevant mitigating evidence. Id. at 114-15 ("Just as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, as a matter of law, any relevant mitigating evidence.") (emphasis in original); Lockett v. Ohio, 438 U.S. 586, 604 (1982) ("[W]e conclude that the Eighth and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.") (emphasis in original).

Because the Illinois Supreme Court considered Wright's Eddings argument on direct appeal, we must examine the State Court's disposition of the issue. The Illinois Supreme Court held that the sentencing court necessarily considered Wright's history because the State specifically asked the judge to take into account all of the evidence presented

during the liability phase. Wright I, 490 N.E.2d at 656. The Illinois Supreme Court also held that the sentencer's finding of one mitigating factor (extreme emotional disturbance at the time of the crime) "indicate[d] that the court did consider the defendant's troubled youth and its contribution, if any, to the mental disturbance existing at the time that the crime was committed." Id. In our view, the Supreme Court of Illinois' holding that the sentencing court "considered all potential mitigating facts in the record, including those adduced at trial," id., as well as the Court's proffered justifications for that holding, do not withstand scrutiny. Foremost, the Illinois Supreme Court never addressed the truly critical statements in this case, i.e., those where the sentencing judge set forth the specific evidence that he would not consider in determining Wright's sentence. The fact that the State requested the sentencer to take into account all of the evidence presented at trial is immaterial when coupled with the specific evidence the sentencing court stated he would disregard. Had the sentencing court agreed to take into account all of the evidence at trial --and said nothing else--he may have complied with Eddings. See, e.g., United States v. Mahoney, 859 F.2d 47, 49-50 (7th Cir. 1988) (sentencing judge need not explicitly state every fact he is relying on to pass sentence). But this is not a case where the sentencer simply neglected to state for the record all of the evidence considered in mitigation./4 Rather, this is a case where the sentencer highlighted all of the evidence he would not consider--including evidence of Wright's traumatic history--a practice that Eddings clearly prohibits, and an issue not addressed by the Illinois Supreme Court.

The sentencing judge was quite clear in what he deemed appropriate factors for consideration in determining Wright's sentence, stating that:

any matters dealing with sympathy, outrage, who the victim was, all the matters that I just mentioned [such as evidence of Petitioner's "wretched" and "pathetic" life] have no bearing on whether the defendant shall receive the death penalty. And again, I note for the

record that I have cited them so the record is clear that I have rejected them, and I have disregarded them in making my decision.

People v. Wright, No. 83-CF-70, Tr. of Sent. Hrg., at 7 (emphasis added). This is the language of exclusion--the very practice that the Supreme Court held constitutionally infirm in Eddings. Indeed, the sentencing judge's remarks in this case are strikingly similar to those in Eddings, where the judge stated that he could not "be persuaded entirely by the fact . . . that the youth was sixteen years old when this heinous crime was committed. Nor can the Court in following the law, in my opinion, consider the fact of this young man's violent background." Eddings, 455 U.S. at 124 (Burger, C.J., dissenting). In both cases, the sentencing judges' statements reflect the wholesale exclusion of certain evidence in determining the appropriate sentence. Eddings makes clear that this practice is improper because it deprives the criminal defendant of the particularized assessment necessary in capital sentencing hearings.

The sentencing judge's additional comments, particularly the court's ultimate conclusion that only one mitigating factor existed, foreclose distinct interpretations. The sentencing judge stated that he had "given great consideration to whether other mitigating factors exist," and that he was "unable to determine the existence of any mitigating factors within or without the statute with the exception [of defendant's extreme mental distress at the time of the offense.]" As the district court noted, Wright presented substantial evidence of a troubled childhood, which clearly qualifies as evidence offered by the defendant in mitigation./5 Although the sentencing judge was not required to afford Wright's history any weight, he was required to consider it. To suggest that the finding of extreme mental and emotional disturbance at the time of the crime necessarily encompassed the evidence of Wright's pitiful life renders the words "at the time of the crime" meaningless. See Wright, 149 F. Supp. 2d at 537. The fact that the sentencer found only one mitigating factor either "within or without the statute" requires the

opposite conclusion than the one reached by the Illinois Supreme Court. To find from these statements that the sentencing judge actually considered Wright's history requires "tortuous reasoning." Id. at 538.

In dissent, Judge Easterbrook quarrels with this analysis and argues that the sentencing judge's remarks illustrate that he considered--but afforded no weight to--Wright's mitigating evidence, including evidence describing his troubled background. However, this approach suffers from an unavoidable inconsistency. As discussed previously, the sentencing judge linked evidence related to Wright's history with other evidence he would not consider, such as sympathy, outrage, who the victim was (including her activities within the community and the recognition that she received for those activities), and certain statements Wright made to the media. If Judge Easterbrook's formulation of the sentencing judge's statements is correct, then the sentencing judge also considered but rejected sympathy, outrage, who the victim was, and statements made to the media, a practice that would have been improper. See, e.g., People v. Bernette, 197 N.E.2d 436, 443 (Ill. 1964) (evidence regarding the victim or her family improper because it bears no relationship to guilt or innocence or the appropriate punishment); People v. Holman, 469 N.E.2d 119, 135 (Ill. 1984) (improper to describe the victim as "unusually bright" or to state that the victim had received numerous awards); People v. Del Vecchio, 475 N.E.2d 840 (Ill. 1985) (jury instruction precluding consideration of sympathy or prejudice was proper). Thus, either the sentencer disregarded all of the categories of evidence mentioned, which would violate Eddings, or he considered but rejected all of the evidence, a course of action raising other concerns.

Perhaps recognizing this inconsistency, the state interprets the sentencer's remarks as excluding only sympathy for the defendant, a practice that the Constitution permits. See California v. Brown, 479 U.S. 538 (1987). While it is true that the individualized assessment regarding the appropriateness of a death sentence should not be based on an emotional response to the mitigating evidence, the sentencer must exercise

great caution not to ignore the evidence giving rise to such responses. See id. at 545-46 (O'Connor, J., concurring). Here, the sentencing judge used language such as "will have no bearing" and "disregarded" in the context of Wright's mitigating evidence, and the sentencing judge did not limit his remarks to the emotional response generated by Wright's background. In short, the sentencer's remarks are so imbued with exclusionary language as to violate the constitutional requirements announced in Eddings.

Judge Easterbrook notes that cases such as Parker v. Dugger, 498 U.S. 308 (1991), Wainwright v. Goode, 464 U.S. 78 (1983), and Rivera v. Sheriff of Cook County, 162 F.3d 486 (7th Cir. 1998), hold that a reviewing court's characterization of what the trial judge found is one of historical fact. While that proposition is unassailable, it does not mean that state courts act correctly in every instance. Indeed, in Parker, the Supreme Court reversed a decision that was not an accurate factual characterization of what transpired at sentencing. Parker, 498 U.S. at 318. Parker involved a capital sentencing judge who weighed aggravating and mitigating factors pursuant to Florida law. On appeal, the Florida Supreme Court held that the judge had erroneously relied upon two aggravating factors. However, rather than remanding the case for resentencing, the Florida Supreme Court held that the absence of any nonstatutory mitigating factors made re-weighing unnecessary and affirmed the death sentence. The Supreme Court of the United States ultimately reversed, finding that the "Florida Supreme Court erred in its characterization of the trial judge's findings, and consequently erred in its review of Parker's sentence." Id. at 318. Parker instructs appellate courts to review the entire record when evaluating a sentencing judge's comments: accurate factual characterization depends upon "an examination of the transcript of the trial and sentencing hearing, and the sentencing order." Id. at 320. The Supreme Court ultimately reversed because the Florida Supreme Court disregarded evidence that contradicted its factual finding. "What the Florida Supreme Court could not do, but what it did, was to ignore the evidence of mitigating circumstances in the record and misread

the trial judge's findings regarding mitigating circumstances, and affirm the sentence based on a mischaracterization of the trial judge's findings." Id.

The same is true in the present case, where the Supreme Court of Illinois did not address the sentencing judge's comments, but instead relied exclusively on the finding of one mitigating factor and the fact that the government asked the court to evaluate all of the evidence produced at trial. Not considering the trial court's comments in this case is tantamount to not considering the evidence of nonstatutory mitigating circumstances in Parker. When viewed in isolation, the State's request that the government consider all of the evidence produced at trial provides adequate justification for the conclusion that the sentencer accounted for Wright's history. But the sentencing judge went further in this case, listing all of the categories of evidence he would not consider. Accordingly, even accepting that we are presented with a question of historical fact, we believe that the Supreme Court of Illinois' finding "is not fairly supported by the record." Parker, 498 U.S. at 320.

We also note that the fact/law distinction in this case is not as pristine as Judge Easterbrook suggests. In Parker, the basis for the Supreme Court's holding was that the legality of the defendant's sentence did not necessarily follow from "a resolution of the question of what the trial judge found." Id. This factor made the interpretation of the sentencing court's remarks a question of fact. Here, however, the question is whether the sentencing court failed to consider Wright's mitigating evidence, and resolution of that question in the affirmative necessarily means that the sentencing judge violated the constitutional requirements announced in Eddings. To say that we cannot evaluate as a matter of law whether the sentencer complied with Eddings because the Supreme Court of Illinois decided as a matter of historical fact that the sentencer complied with Eddings engages in a circularity not required by Parker.

With due deference to the appropriate restraints of federalism and the limited

role of this court on habeas review, there can be no question that the law clearly requires a sentencing judge to evaluate the individualized circumstances of each capital defendant prior to imposing the death penalty. Because the sentencing court's statements reflect the wholesale exclusion of evidence offered by Wright in mitigation, we conclude with constitutionally grounded certainty that Wright did not receive the individualized sentence as mandated by Eddings.

B.   Ineffective Assistance of Counsel

Wright cross-appeals the district court's decision to deny relief for ineffective assistance of trial counsel. Wright argues that trial counsel was ineffective for failing to discover, investigate and introduce 50 pages of medical records describing Wright's mental health history that would have both corroborated his trial testimony and supported a GBMI verdict. According to the district court, the 50 additional pages contained information that Wright had I.Q. test scores of 73 to 81, which classifies him as a person of borderline mental deficiency. The records further discuss Wright's history of taking prescription psychiatric drugs, his testimony regarding his traumatic life before his adoption at age four, and the fact that his adoptive parents abused him. Wright alleges that trial counsel's performance fell below an objective standard of reasonableness because there is no valid strategic reason for failing to investigate and introduce Wright's hospital records. In addition, Wright challenges trial counsel's failure to investigate evidence regarding Wright's alleged organic brain damage. With respect to prejudice, Wright maintains that there is a reasonable probability that a jury would have returned a verdict of guilty but mentally ill had the jury considered evidence beyond Wright's self-serving testimony.

In response, the State argues that this issue is procedurally defaulted. In his first petition for post-conviction relief before the Illinois courts, Wright argued that counsel was ineffective for failing to introduce certain records during the sentencing phase. In a second post-conviction petition before the Illinois

courts, Wright challenged trial counsel's decision not to pursue a GBMI verdict, but the Illinois Supreme Court held that he had waived the claim for failing to raise it in his first petition. Wright III, 723 N.E.2d at 239. The district court ruled that the procedural default constituted an adequate and independent ground for relief and refused to address counsel's failure to raise a GBMI defense. Accordingly, the district court limited its ineffectiveness inquiry "to the issue of omitted evidence pertaining to Wright's mental health." Wright, 149 F. Supp. 2d at 533.

We assess ineffective assistance of counsel claims under the standards enunciated by the Supreme Court inStrickland v. Washington, 466 U.S. 668 (1984). Under Strickland, a defendant must establish (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that the deficient performance resulted in prejudice to the defendant. Id. at 687. To demonstrate deficient performance, a defendant must show that he has been denied his Sixth Amendment right to a fair trial as the result of the incompetence of defense counsel. See, e.g., Eddmonds v. Peters, 93 F.3d 1307, 1313 (7th Cir. 1996). "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Strickland, 466 U.S. at 687. In this context, it is not reasonable to judge counsel's performance based on "hindsight." Instead, we evaluate counsel's performance based upon her perspective at the time of trial. Id. at 689.

Before reaching the merits of Wright's appeal, we must clarify what ineffective assistance claims survive. In our view, the district court correctly held that trial counsel's failure to urge a GBMI verdict was procedurally defaulted. See Wright, 149 F. Supp. 2d at 533. The Illinois Supreme Court held that Wright had failed to raise this issue in his first petition for post-conviction relief and that it was therefore procedurally defaulted. Wright III, 723 N.E.2d at 239. This is an adequate and independent state justification, a decision that we must respect even in the pre-AEDPA context of this case. See Coleman v. Thompson, 501

U.S. 722, 729 (1991). Accordingly, we will not reach the merits of whether trial counsel was ineffective for failing to raise this issue.

That leaves trial counsel's failure to obtain the 50 pages of additional medical records. Here, we note that this is not a case where trial counsel wholly failed to investigate--or cursorily investigated-- the defendant's insanity. See Brewer v. Aiken, 935 F.2d 850 (7th Cir. 1991); Harris v. Dugger, 874 F.2d 756, 763 (11th Cir. 1989); Profitt v. Waldron, 831 F.2d 1245, 1248-49 (5th Cir. 1987). Wright's trial counsel took reasonable steps to identify and locate his mental health records. The record in this case reveals that trial counsel received an "extensive" number of psychiatric documents concerning Wright's mental health, and that trial counsel's access to the documents he did possess enabled him to conduct an extensive cross-examination of the State's psychiatric expert who testified at trial. See Wright II, 594 N.E.2d at 280-81. At the time of trial, counsel had received most of Wright's medical records. Because certain state agencies and mental institutions neglected to turn over all of the records does not mean that counsel acted deficiently. An attorney's investigation need not be unlimited in scope or unerring in execution, but merely reasonable. Rogers v. Israel, 746 F.2d 1288, 1294 (7th Cir. 1984). We need not decide whether Wright was prejudiced by the failure to obtain the additional records because we hold that counsel's performance did not fall below an objective standard of reasonableness. Strickland, 466 U.S. at 697.

III.  Conclusion

Because the sentencing judge excluded from consideration mitigating evidence about Wright's traumatic history, we AFFIRM the district court's decision vacating the death penalty. We also AFFIRM the decision to deny relief based upon ineffective assistance of counsel. Trial counsel obtained most of Wright's medical records, and these efforts did not fall below an objective standard of reasonableness.

FOOTNOTES

/1 The district court addressed seven distinct claims in its opinion; however, the parties raise only two on appeal.

/2 For a more thorough recitation of the facts of Wright's crime, see People v. Wright, 490 N.E.2d 640, 642-44 (Ill. 1985). We have recounted only those facts necessary for the disposition of this appeal.

/3 Wright initially filed for post-conviction relief in Illinois State court. That petition was denied without a hearing, a decision that the Illinois Supreme Court affirmed on appeal. See People v. Wright, 594 N.E.2d 276 (1992) ("Wright II"). At that point, Wright petitioned for a writ of habeas corpus in federal court. Shortly there-after, however, Wright filed a second amended post-conviction petition in state court and moved the district court to stay the proceedings pending exhaustion of state court remedies. The Illinois trial court eventually dismissed Wright's second amended petition. Wright again appealed to the Illinois Supreme Court, which affirmed the dis-missal. See People v. Wright, 723 N.E.2d 230 (Ill. 1999) ("Wright III").

/4 It is true that some sentencing judges might deem Wright's traumatic background an aggravating--as opposed to a mitigating--circumstance. (Dissent, slip op. at 20-25) However, notwithstanding Judge Easterbrook's skepticism, the individualized assessments necessary in capital sentencing proceedings required the sentencer to take into account all of Wright's evidence, a requirement not met in this case. With due respect to Judge Easterbrook's characterization, not considering evidence--such as Wright's history, the sympathy generated from that history, who the victim was, and certain statements made to the media--is not the same as considering but affording little weight to the mitigating effects of that evi-dence.

/5 Contrary to the dissent's assertion, we do not suggest that the evidence presented by Wright was necessarily mitigating, or that the sentencer was required to afford it mitigating weight. Rather, we find that it was constitutional error for the sentencing court affirmatively to refuse to consider a category of potentially mitigating evidence offered by the capital defendant. This case does not present the question of how the sentencing court interpreted evidence offered by Wright. Instead, it concerns the sentencing court's decision not to examine such evidence at all.

Easterbrook, Circuit Judge, dissenting in part. Patrick Wright had a troubled childhood and has led a wretched life. Since the age of 15 Wright has spent most of his days in custody and wreaked mayhem when free. In sentencing Wright to death for home invasion, robbery, sexual assault, and murder, the state judge--acting as trier of fact after Wright waived his right to have his fate determined by a jury--admitted all of the evidence Wright offered in mitigation and observed: "I don't think any reasonable person who has heard all of the evidence in this case can feel anything but sympathy for the pathetic creature, Patrick Wright". But the judge added that he would not allow sympathy to affect his sentence.

Wright entered the Specht home intending to steal what he could and kill anyone who got in his way. He slit Connie Specht's throat, in her mother Carol's presence, after trying but failing to rape both the girl and the woman; he stabbed Carol to death. Connie survived and called the police. Wright confessed; that plus physical evidence and Connie's account leave no doubt of his guilt. The judge found that aggravating circumstances far outweighed any mitigating factors (particularly the judge's conclusion that Wright acted "under the influence of [a shoe fetish, which amounted to] extreme mental or emotional disturbance"). My colleagues hold that by declining to treat Wright's upbringing as an additional factor in mitigation, independent of its effect on his mental state, the judge violated the Constitution. I do not agree with this conclusion. There is a big difference between a legal rule forbidding a judge to give mitigating weight to some factor and a legal rule compelling a judge to give mitigating weight to that factor. Eddings v. Oklahoma, 455 U.S. 104 (1982), and Lockett v. Ohio, 438 U.S. 586 (1978), condemn the former but do not require the latter. They hold that "the sentencer in capital cases must be permitted to consider any relevant mitigating factor" (Eddings, 455 U.S. at 112); they do not hold that the sentencer must deem any particular factor to be mitigating. Wright's sentence therefore is lawful, and I dissent from the majority's contrary decision--though I join its conclusion that the judgment of conviction is valid.

My colleagues start with the fact that the judge who sentenced Wright said, after summarizing the evidence (and making the comments I have quoted);

[A]ny matters dealing with sympathy, outrage, who the victim was, all the matters I just mentioned have no bearing on whether the defendant shall receive the death penalty. And again, I note for the record that I have cited them so the record

is clear that I have rejected them, and I have
disregarded them in making my decision.

Then they compare this with the "strikingly
similar" statement held in Eddings to demonstrate
a violation of the Constitution (slip op. 10):

Nor can the Court in following the law, in my
opinion, consider the fact of this young man's
violent background.

The judge in Wright's case "disregarded" his
childhood; the judge in Eddings's case declined
to "consider" it; these come to the same thing,
my colleagues hold. But they are the same thing
only if they reflect the same understanding of
the judge's discretion--which they do not. The
judge in Eddings thought that the law forbade him
to give weight to the defendant's troubled child-
hood. This is the import of "[n]or can the Court
in following the law" give weight to that factor
(455 U.S. at 109, emphasis in original). As the
Justices remarked: "From this statement it is
clear that the trial judge did not evaluate the
evidence in mitigation and find it wanting as a
matter of fact; rather he found that as a matter
of law he was unable even to consider the evi-
dence." Id. at 113. Eddings added that the
state's "Court of Criminal Appeals took the same
approach. It found that the evidence in mitiga-
tion was not relevant because it did not tend to
provide a legal excuse from criminal responsibil-
ity." Ibid. That view conflicted with the consti-
tutional principle that a "sentencer [may] not be
precluded from considering, as a mitigating
factor, any aspect of the defendant's character
or record . . . that the defendant proffers as a
basis for a sentence less than death." Lockett,
438 U.S. at 604 (plurality opinion; emphasis in
original), quoted with approval in Eddings, 455
U.S. at 110.

Lockett and Eddings hold that whoever wields
the power to impose capital punishment also must
have unfettered discretion to dispense mercy. To
say that there is discretion is to say that the
sentencer may be unmoved--even may treat a
wretched childhood as a factor in aggravation be-
cause it implies that the defendant is inured to
violence and thus more likely to be incorrigible.
Nothing in Eddings (or any other decision) com-
pels the sentencer to give favorable weight to a
circumstance proffered in mitigation. Burger v.
Kemp, 483 U.S. 776 (1987), illustrates this
point. Burgeraccused his lawyer of ineffective
assistance for failing to present evidence of his
unhappy childhood and abusive family. The Court
held that this omission did not violate the
Constitution in light of the risk that the sen-
tencer would deem the background damning: evi-

dence showing that a person had a rough past and
fell in with a bad crowd often implies future
dangerousness. Id. at 793-94.

   We have elaborated on this in a series of
decisions that, like Burger, the majority disre-
gards. Stewart v. Gramley, 74 F.3d 132 (7th Cir.
1996), is the most thorough and worth an extended
quotation:

We are mindful of [the argument] that anything
which serves to amplify the personal history of
the defendant and by doing so furnishes clues to
the causality of the crime for which he has been
sentenced to death makes such a sentence less
likely to be imposed. Causality is mitigation,
the lawyer argued. Tout comprendre c'est tout
pardonner. It is not an absurd argument. It
exploits the tension between belief in determin-
ism and belief in free will. If the defendant's
crime can be seen as the effect of a chain of
causes for which the defendant cannot be thought
responsible--his genes, his upbringing, his
character as shaped by both, accidents of circum-
stance, and so forth--then a judge or jury is
less likely to think it appropriate that he
should receive a punishment designed to express
society's condemnation of an evil person. We
consider a rattlesnake dangerous but not evil.
Maybe if we learned enough about Walter Stewart
we would consider him a person who had no more
control over his actions than a rattlesnake has
over its actions.

But not everyone who believes that human actions
are as much the consequences of causal factors as
anything else in nature denies that man is "free"
to refrain from "voluntary" acts such as murder
and is therefore blameworthy if he does not.
"Compatibilists" since Hume have argued that
human action is both caused and, for purposes of
ascribing moral and legal responsibility, free.
We cannot resolve a philosophical debate. And
need not. It is enough for our purposes that
capital punishment is not premised on--indeed is
inconsistent with--the view that the only reason
we think that people act "voluntarily" is that we
have not studied the antecedents of their actions
carefully, and that the purpose of a death-penal-
ty hearing is to investigate the defendant's
history in sufficient depth to dispel the illu-
sion that he was free not to commit the crimes
for which he is being condemned. For then the
sentence of death would be the proof that the
lawyers had not done their job. And since it
obviously is not the theory of capital punishment
that murderers are compelled to murder by their
past and therefore should not be punished, it
cannot be right that anything brought out at a
death-penalty hearing is certain or even likely

to help the defendant to save his life. What is brought out that will help him is what goes to show that he is not as "bad" a person as one might have thought from the evidence in the guilt phase of the proceeding. What is brought out that will hurt him is what goes to show that he is, indeed, as bad a person, or worse, than one might have thought from just the evidence concerning the crime.

At the sentencing hearing members of Stewart's family and his former supervisor at work testified that he had been abandoned by his mother when he was an infant (he does not know who his father was) and had been brought up by his grandparents in Michigan. His grandmother died when he was 15. He had moved to Chicago with his grandfather a few years earlier. He was friendly, worked some and got along with his coworkers, and attended church regularly. Ten years after moving to Chicago he held up the jewelry store. Shortly before that his grandfather had died and Stewart had been distraught. In the closing argument at the sentencing hearing his lawyer did not mention Stewart's personal history although he had brought it out at the hearing through the testimony that we have just summarized.

The fruits of the investigation by Stewart's current lawyers are summarized in a report by a "mitigation specialist" backed up by affidavits. According to the report Stewart was born at home without the assistance of a doctor and fell on the floor on his head when he emerged from his mother's body. His mother was 19 years old and gave Stewart to her parents when he was six months old. She does not know the name of his father. She eventually moved in with her parents, so that she was living in the same house with Stewart, but she did not treat him as her son and displayed no affection for him. When Stewart was 12 his grandfather, whom he doted on, had a mental breakdown. Stewart was a hyperactive child, did badly in school, and dropped outafter the ninth grade. Coming from rural Michigan Stewart was not used to the guntoting ways of his Chicago age-mates and imitated their behavior, which included carrying and using guns. At age 13 he fell under the influence of his cousin Geraldine, "a hustler who got her money through swindling people." Fagan-like, Geraldine used Stewart "as her apprentice and bodyguard." The affidavit of one of Stewart's sisters states that "Geraldine is the rotten egg of the family." Stewart "was enthralled by Geraldine's lifestyle," and "turned increasingly to crime, primarily robberies." He began using drugs, and for a time was a heroin addict. Once, while under the influence of heroin (which, the "mitigation specialist" pointed out, can injure the brain),

Stewart "beat Wanza[another one of his sisters]
very badly and the police had to be called."

Much of this narrative is irrelevant, such as the
circumstances of Stewart's birth, the fact that
his grandfather had a mental breakdown, and the
heroin addiction. The purpose of these details is
to insinuate that Stewart may have brain damage,
but of this there is absolutely no evidence . .
. . As for his falling among evil companions, it
is obvious that one does not become a teenage
robber without being initiated into criminal
activity by older hands, not uncommonly a rela-
tive. As for drug abuse, the report does not
suggest and there is no evidence that Stewart
committed the robbery and murders while under the
influence of any drug, or, as we have already
noted, that he has any organic brain damage. That
he comes from a broken home and was brought up in
a poor, rough neighborhood of Chicago was known
at the sentencing hearing . . . . The report of
the mitigation specialist adds colorful details
possibly relevant under a tout comprendre defense
if one existed, but not calculated to make a
judge or jury think Stewart less deserving of the
death penalty.

The mitigation specialist's reference to
Stewart's having embarked on a criminal career
consisting "primarily of robberies" after he met
cousin Geraldine when he was 13 is highly rele-
vant to appraising the likely impact of current
counsel's thorough investigation on a sentencing
judge. The criminal record that was put before
the judge understated, we now know as a result of
the investigation, Stewart's actual criminal
history. Evidently the nine crimes of which he
had been convicted (or sentenced to supervision)
were only the tip of the iceberg. He had been a
career criminal from the age of 13. This was, it
appears, when he began to "use guns." The impli-
cation is that when he started on the robbery
trail he used guns in his robberies, and recall
that one of his convictions was for armed rob-
bery--committed when he was only 14. The murders
in the jewelry store were the predictable culmi-
nation of his criminal career. He was by then a
hardened, dangerous, and seemingly inveterate
criminal.

74 F.3d at 136-37. Recently we have made the same
point succinctly:

All that Britz's meticulously researched personal
history shows, as in the other cases we have
cited, is that he led a disordered life culminat-
ing in the murder for which he has been sentenced
to death. People with his background of antiso-
cial behavior are more likely to commit murders
than other people, but this does not make them

attractive candidates for lenity; rather, it underscores their dangerousness.

Britz v. Cowan, 192 F.3d 1101, 1104 (7th Cir. 1999). A judge who shared this perspective would have admitted the evidence of Wright's background, expressed compassion for him as a victim of others' wrongs, given mitigating weight to any mental limitations caused by whatever abuse he had endured, and finally declared the offender's background otherwise not a reason to reduce his punishment. That is exactly what this sentencing judge did do! So where is the constitutional flaw? Is it that a state judge is forbidden to go straight to the bottom line, without articulating the intermediate steps laid out in Stewart? Or perhaps there is a need for magic words, as the majority implies in stating that a judge must declare something like "I have taken X into account but given it no weight"? Why there is a constitutional difference between "I have rejected X" (which this judge said) and "I have given X no weight," my colleagues do not explain. Anyway, an obligation to state affirmatively that some circumstance has been "taken into account" cannot be found in Eddings (the majority cites no source at all for this directive, which appears at slip op. 9 n.4), and as a new rule it may not be applied in a collateral attack. See Teague v. Lane, 489 U.S. 288 (1989). My colleagues must think their approach a logical extension of Eddings, but Teague puts extensions (logical and otherwise) off limits.

Let us return, then, to the rule stated by the Supreme Court in Eddings: that no state may forbid a capital sentencer to consider any ground advanced in mitigation. Because the judge's explanation was curt, it is impossible to exclude the possibility that he sought to convey the same message as the judge in Eddings. Yet if this is what he meant, his expression was inept; the key phrase from Eddings ("[n]or can the Court in following the law . . . consider" certain evidence) is missing and not replaced by an equivalent. One would expect a judge to be able to announce a conclusion that the law (as he understood it) disabled him from taking some factor into account. Yet Illinois law was (and is) clear that a troubled youth may be considered in mitigation, see People v. Lewis, 88 Ill. 2d 129, 144, 430 N.E.2d 1346, 1352 (1981), so it is not surprising that the judge did not mention any legal prohibition. To read this judge's brief oral statements as foreclosing on legal grounds all possibility that a person's childhood could mitigate his punishment is to accuse him of failing to know and follow state law--which not only would be inappropriate (a presumption of irregularity?) but also is not the reading given

to the judge's remarks by the Supreme Court of Illinois, which found no violation of the state's consider-everything norm. People v. Wright, 111 Ill. 2d 128, 166-68, 490 N.E.2d 640, 656 (1985). (The state's highest court considered and sustained the conviction and sentence twice more on collateral review. See People v. Wright, 149 Ill. 2d 36, 594 N.E.2d 276 (1992); People v. Wright, 189 Ill. 2d 1, 723 N.E.2d 230 (1999). Wright did not renew in either of those proceedings any contest to the interpretation given in 1985 to the sentencing judge's remarks.)

The most one can say is that the statements were ambiguous--as oral expressions so often are--because they did not explicitly draw a distinction between legal rules and case-specific application. Did the judge mean that Wright's childhood may not be considered (a legal error) or only that Wright's childhood will not be considered (a factual conclusion that the evidence did not justify mercy)? The meaning of an ambiguous pronouncement is a question of fact, not of law. Parker v. Dugger, 498 U.S. 308, 320 (1991); Wainwright v. Goode, 464 U.S. 78, 83-85 (1983); Rivera v. Sheriff of Cook County, 162 F.3d 486 (7th Cir. 1998). Because meaning is a fact, the state appellate court's resolution controls unless not fairly supported by the record. This principle--a holding of Parker, Goode, and Rivera alike--governs pre-aedpa cases under the old 28 U.S.C. (1994 ed.) sec.2254(d)(8) and newer cases under the current sec.2254(e)(1). The majority's opinion seems to rest on the view that, because the state judge's words are in black and white on paper, we can decide their meaning as readily as the state's highest court. The view that findings based on documents may be freely reviewed by appellate tribunals was ringingly rejected in Anderson v. Bessemer City, 470 U.S. 564, 573-75 (1985), with respect to the relations between trial and appellate judges in a unitary judicial system; it is even less persuasive when applied to relations between the state judicial system and the federal.

Reading the sentencing judge's statement as a finding that he was not swayed by Wright's background, as opposed to a declaration that he was legally forbidden to consider it, is fairly supported by the record; it is, indeed, the most natural reading. The judge did not imply that he thought himself blocked by a rule of law from dispensing mercy that he deemed warranted. Unless the sentencing judge thought the law an obstacle to acting on mitigating evidence, there is no problem under Eddings. Because the judge did not declare that the law stopped him from reducing Wright's sentence, the Supreme Court of Illinois' resolution of the ambiguity is supported by the

record, and thus conclusive in this collateral attack. My colleagues say in response that the court's "holding [does] not withstand scrutiny" (slip op. 8). To call the Supreme Court of Illinois' conclusion a "holding" is to call it a proposition of law, which in pre-aedpa cases we review without deference. It is not a "holding," however; it is a finding of fact. The state judge gave thought to (and believed himself legally entitled to reduce a sentence because of) Wright's childhood, or he did not; the Supreme Court of Illinois concluded that he had done so (this is the point of its statement that the judge "considered all potential mitigating facts in the record", 111 Ill. 2d at 168, 490 N.E.2d at 656).

Characterizations of what happened are facts, even when they are entangled with legal issues and determine the outcome of the litigation. See, e.g., Pullman-Standard v. Swint, 456 U.S. 273, 288 (1982) (whether particular conduct is "discrimination" is a question of fact); Icicle Seafoods, Inc. v. Worthington, 475 U.S. 709 (1986) (whether a worker is a "seaman" is a question of fact). See also Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 399-405 (1990) (characterizations under fact-dependent legal standards, such as whether a suit is frivolous, are treated as facts and thus subject to deferential appellate review). What the state judge thought about the extent of his discretion is a proposition about the state of the world, not about the state of the law. That's the point of Baron Bramwell's famous observation that "[t]he state of a man's mind is just as much a fact as the state of his digestion." Edgington v. Fitzmaurice, 29 Ch. Div. 459, 483 (1885). The Supreme Court of Illinois told us what we need to know about the state of the sentencing judge's mind. See also Banks v. Hanks, 41 F.3d 1197 (7th Cir. 1994).

Wright tries to get mileage from the context of the sentencing judge's declaration: "any matters dealing with sympathy, outrage, who the victim was, all the matters I just mentioned have no bearing on whether the defendant shall receive the death penalty." To lump "sympathy" with "outrage" is to imply that the same rule applies to both, and as "outrage" should not be considered, the sentencing judge must have thought that "sympathy" should not be considered either. That is another possible reading--one my colleagues embrace, slip op. 11-12--but not one that the state courts were compelled to adopt. The statement "X, Y, and Z have no bearing on whether Wright shall be sentenced to death" could mean "X, Y, and Z have no bearing on whether Wright shall be sentenced to death, for one legal reason

applicable to all three grounds." Or it could mean "X, Y, and Z have no bearing on whether Wright shall be sentenced to death, because none of them makes any difference to me as a matter of fact." The Supreme Court of Illinois could complete the sentence either way--and it chose the latter way, with considerable logical support, for reasons I have covered. My colleagues demand "constitutionally grounded certainty that Wright [received] the individualized sentence . . . mandated by Eddings" (slip op. 14, emphasis added), but no rule of law calls for "certainty". Such a demand contradicts Parker and Goode (a state court's findings of fact matter only when there is un-certainty!) and transgresses Teague as well (the majority does not cite any pre-1985 case, indeed any case at all, for its insistence on "certainty"). The idea that a record's silence on some important matter, and consequent lack of "certainty," requires a federal court to annul a state court's judgment finds no support in the Supreme Court's cases, and many hold the contrary--most recently, Mickens v. Taylor, 122 S. Ct. 1237 (2002) (silence about the effect of counsel's conflict of interest, as a result of judge's failure to inquire, does not lead to relief even in a capital case).

   Giving an ambiguous statement a meaning that renders it unconstitutional (and a violation of state law to boot) disrespects the state judge's legal skills and denigrates the role of the state judiciary in resolving disputed issues of fact. My colleagues treat a state judge imposing sentence as if he were an administrative law judge in a Social Security disability case, obliged to use prescribed verbal formulas and required to tie up all loose ends on pain of remand, and they disdain the decision of the state's highest court. That is not the right relation between the state and federal judiciaries. A state judge is not an alj, and it is a state's appellate judiciary rather than a federal court on collateral review that untangles ambiguities attending oral expositions. Nor is an insistence that only "certainty" suffices the right relation between a court of appeals and the Supreme Court of the United States.

   Finality and expedition are important in every criminal case. The meaning of this statement was resolved in 1985. Words offer only a cloudy window into the sentencing judge's thoughts, so reasonable people could disagree about their import; the Justices of the Supreme Court of Illinois did disagree in 1985, dividing five to two about this subject. Seventeen years later two federal appellate judges sign on with the dissenters. That delay does more to show the wisdom of the rule treating these matters as factual

(which allows the state's decision to stand) than to justify throwing the state-court decision out the window and treating the issue as res nova. If matters had been resolved differently in 1985, all doubt could have been resolved, likely just by asking the sentencing judge what he had meant by his statements. Now it is too late--and delay is a powerful reason to treat this subject as one of fact, in order to bring disputes such as this to timely closure.

No resentencing 20 years after the fact can be as good as the one now upset: human memory fades, so the accuracy of sentencing degrades. New errors are bound to occur, mistakes that likely will be more substantial than the ambiguity that concerns my colleagues. Yet no substantial federal question compels a new proceeding. Lockett and Eddings settle the major legal question; only implementation remains. Nonetheless, by holding that both the passage of time and the findings of the state's highest court are irrelevant, my colleagues create legal problems concerning federalism, the vitality of the rule stated by Parker and Goode, the novel demand for "certainty" in adjudication, and the application of Teague to the majority's innovations.

To treat an ambiguity in two off-the-cuff sentences as spoiling a sentence reviewed and sustained three times by a state's highest court--while giving the findings of that court no respect--is to abuse the power conferred by 28 U.S.C. sec.2254. Wright is now 59 years old; he will die of old age before we permit the State of Illinois to carry out its judgment.