In the

# United States Court of Appeals
## For the Seventh Circuit

No. 01-3503

JEROME WHITE,

*Petitioner-Appellee,*

*v.*

SALVADOR A. GODINEZ,

*Respondent-Appellant.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 94 C 2055—**Harold A. Baker**, *Judge.*

ARGUED MAY 13, 2002—DECIDED AUGUST 22, 2002

Before ROVNER, DIANE P. WOOD, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* Jerome White was convicted, following a jury trial in state court, of murder and conspiracy to commit murder. After his conviction was affirmed on direct appeal and state post-conviction relief was denied, White petitioned for habeas corpus, asserting, among other things, that his trial counsel was ineffective because he failed adequately to consult with him before trial and failed to call his alleged accomplice, Bernice Caldwell, to testify in his defense. In an earlier appeal, we held that the district court erred in dismissing his claim without an evidentiary hearing on the question of counsel's performance, and that White had established

that he was prejudiced by counsel's performance. *White v. Godinez*, 143 F.3d 1049 (7th Cir. 1998) (*White I*). After hearing evidence on remand, the district court held that trial counsel's performance was constitutionally inadequate and granted the writ of habeas corpus. We agree that White has demonstrated that counsel's performance was inadequate, and finding no basis to disturb our earlier holding that prejudice was established, affirm the judgment of the district court.

## I. BACKGROUND[1]

Waymond Jackson and Donald Stewart were robbed and shot by Doyle Johnson and Al Walker at the Pesotum rest area on Interstate 57 near Champaign, Illinois. Jackson died, but Stewart survived. Jerome White and Bernice Caldwell (whom White refers to as his common-law wife) were charged with murder and conspiracy to commit murder for hiring Johnson and Walker to kill the victims. At Jerome White's trial, Johnson, the state's primary witness, testified that the victims were competitors to a prostitution business run by White and Caldwell at the Pesotum rest area, who wanted them "taken out of the game." Johnson said that he and Walker met White and Caldwell in Chicago and rode with them to Champaign, Illinois. During that trip, according to Johnson, White offered Johnson and Walker each $1,000 to do the job. When they arrived in Champaign, Johnson and Walker accompanied White and Caldwell to Caldwell's home, where they obtained a rental car and guns.

The theory of defense relied on by White's counsel, Michael Green, was that it was Jerome's brother, Michael

---

[1] The facts of this case are presented in greater detail in *White I*, 143 F.3d 1049.

White, who hired Johnson and Walker to shoot the two victims. This theory was consistent with Johnson's original statement to police, which implicated Michael White. But Johnson changed his story 5 days before trial and instead implicated Jerome White. Green's theory was contradicted by Caldwell's young daughter, Theresa, who testified that she saw Jerome White (not Michael) and her mother meet with two men at Caldwell's home on the night of the murder. The police also verified that Michael White had an alibi—he was on a Greyhound bus traveling to Champaign and could not have met with Johnson in Champaign at the time that the murder was planned.

After his conviction was affirmed on direct appeal, White filed a petition for post-conviction relief in state court which included the claims at issue in this appeal: that Green rendered ineffective assistance by meeting with him for just 20 minutes before trial and failing to consult with him regarding potential witnesses and trial strategy. The circuit court dismissed his petition without an evidentiary hearing, the appellate court affirmed, and the Illinois Supreme Court denied leave to appeal. *See White I*, 143 F.3d at 1052. White then filed a petition for habeas corpus in federal district court. As to the ineffective assistance claims that are still at issue, we held that the district court erred in dismissing his claims without conducting an evidentiary hearing. We also held that White had established that Green's performance prejudiced him. *White I*, 143 F.3d at 1054-56.[2]

---

[2] We also concluded that the district court erred in holding that other claims were procedurally defaulted, but the Supreme Court directed that we reevaluate our decision in light of *O'Sullivan v. Boerckel*, 526 U.S. 838 (1999). *See Godinez v. White*, 526 U.S. 1001 (1999). On remand from the Supreme Court, we held that

(continued...)

On remand from this court, the district court held an evidentiary hearing. White testified that his trial attorney, Michael Green, met with him twice before trial. At the first meeting, which was five months before trial and lasted 10 minutes, White and Green discussed Green's fee and how White would pay it. After this meeting and before trial, White telephoned Green's office but Green did not return his phone calls. White did not meet with Green again until the evening before trial. At that second meeting, which lasted 20 minutes, they discussed jury selection issues, Theresa Caldwell's testimony, and the possibility that Bernice Caldwell would testify for the state.

According to White, he asked Green to explore the possibility of Caldwell's testifying on his behalf, but Green ignored his request. Green never discussed trial strategy or any other possible defense witnesses, including White himself, and never asked for information relevant to the defense. White offered an affidavit from Bernice Caldwell, in which she stated that she would have testified at White's trial, and the transcripts of Caldwell's and White's testimony from Caldwell's trial. The testimony contained in those documents is consistent with White's version of what he and Caldwell would have said if called to testify at his trial: that he and Caldwell were at her home on the night of the murder, went to bed shortly after arriving there with Johnson and Walker, and discovered that the guns and rental car were missing when they awoke.

White also introduced inmate visitor logs from the jail which show that Green signed in and out for meetings

---

[2] (...continued)
the claims at issue in this appeal survived and were not procedurally defaulted. *White v. Godinez*, 192 F.3d 607 (7th Cir. 1999) (*White II*).

with White twice. According to those records, the first time Green signed out 15 minutes after he signed in, and the next time he signed out 30 minutes after he signed in. White testified that on the evening of the second visit, he was in the shower when he learned that he had visitors and that it took him five to seven minutes longer than usual to reach the visitor area. The county sheriff, who oversaw operations at the jail where Green was detained before and during the trial, testified (by way of deposition admitted at the hearing) that it was the jail's practice to record all inmate visits and that he could not remember a single incident of an officer's failing to record an attorney's visit during his twenty-year tenure.

The district court concluded that Green's performance was outside the range of professionally competent representation. Based on this court's earlier holding that White was prejudiced by Green's performance, the district court granted White's petition for a writ of habeas corpus. The state appeals and, for the reasons that follow, we affirm.

## II. ANALYSIS

We evaluate White's claim of ineffective assistance of counsel under the two-part standard of *Strickland v. Washington*, 466 U.S. 668 (1984), which requires that a defendant show that the attorney's performance fell below "an objective standard of reasonableness," 466 U.S. at 688, and "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694; *Henderson v. Walls*, 296 F.3d 541, 553 (7th Cir. 2002). White's petition was filed before the effective date of the Antiterrorism and Effective Death Penalty Act (AEDPA), so we apply pre-AEDPA standards. *Wright v. Walls*, 288

F.3d 937, 941-42 (7th Cir. 2002); *White I*, 143 F.3d at 1053. We presume correct the state court's determination of historical fact, *Kavanaugh v. Berge*, 73 F.3d 733, 735 (7th Cir. 1996), and review the district court's findings of fact for clear error. *Griffin v. Camp*, 40 F.3d 170, 172 (7th Cir. 1994). We review de novo the questions whether counsel's performance was constitutionally deficient and whether that performance prejudiced the defendant. *Strickland*, 466 U.S. at 698; *Wright*, 288 F.3d at 942.

A. Deficient Performance

As the district court noted, the question which remained after our remand in *White I* was whether Green adequately consulted with White and investigated the facts necessary for an adequate defense. The Supreme Court has recognized counsel's duty to consult with his client as one of the basic components of adequate representation:

> Representation of a criminal defendant entails certain basic duties. . . . From counsel's function as assistant to the defendant derive the overarching duty to advocate the defendant's cause and the more particular duties to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution.

*Strickland*, 466 U.S. at 688. A brief consultation does not by itself establish that counsel's performance was inadequate. *White I*, 143 F.3d at 1054. But as we noted in the earlier appeal, if the alleged inadequate consultation caused counsel to misapprehend or fail to investigate the facts necessary for an adequate defense, then his later "missteps . . . are almost necessarily not attributable to sound strategic decisions." 143 F.3d at 1054. In this way, the two

issues relating to Green's performance—his allegedly in-adequate consultation and his failure to investigate or call Bernice Caldwell as a witness—are intertwined.

The district court found that Green met with White only twice before trial for a total of less than 45 minutes, crediting White's testimony about the number, duration, and subject of his meetings with Green.[3] The district court concluded that, given the circumstances of this case, Green's consultation with White was inadequate. The court noted that the defendant faced the death penalty for charges of armed robbery, murder, and conspiracy arising from a plot involving "the machinations of multiple players, all with their own rivalries and motives." The court rejected the state's assertion that Green was able to fully comprehend the nature and evidence of the case with so little consultation.[4] The court found that because of the short consultation and the limited subjects covered, Green was inadequately prepared and unable to make a reasonable decision not to explore Bernice Caldwell's possible testimony or to explore an alternative defense that would be supported by her testimony. According to the district court, this inadequate preparation and investigation led to Green's decision to mount an implausible defense based on the theory that it was Michael White who conspired with Bernice Caldwell to murder the victims.

---

[3] The state court made no findings on these issues, instead disposing of White's claim based on prejudice, *see People v. White*, 536 N.E.2d 481, 486 (Ill. App. Ct. 1989), so we focus our review on the district court's findings of facts. *See United States ex rel. Partee v. Lane*, 926 F.2d 694, 699 (7th Cir. 1991).

[4] By comparison, the court found that the other players charged or implicated in the conspiracy spent considerably more time consulting with their court-appointed attorneys: Bernice Caldwell (13 hours); Michael White (20 hours); Derrick White (10 hours).

The state's arguments on appeal for the most part take issue with the district court's credibility determinations and invite us to reweigh the evidence—arguments that miss the mark given the scope of our review of the district court's factual determinations, which, as we said, is for clear error. *See Anderson v. City of Bessemer City*, 470 U.S. at 573-74 (1985) ("If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently."). For example, the state questions the district court's reliance on the jail records, pointing out that the records were not always complete and sometimes lacked arrival and departure times. Because of their incompleteness, according to the state, the records could not prove that there were only two jail visits or that Green's consultation with White was limited to 45 minutes. We agree with the district court that the sheriff's testimony was sufficient to support the admissibility of the logs as records of a regularly conducted activity, *see* Fed. R. Evid. 803(6), and that the state's arguments about incompleteness implicate the weight, and not the admissibility, of the records. *See United States v. Keplinger*, 776 F.2d 678, 694-95 (7th Cir. 1985). In any event, the district court's finding that the visits were limited to 45 minutes was also supported by White's unrebutted testimony, and the state has not given us sufficient reason to second-guess the court's decision to credit that testimony. *See Foster v. Schomig*, 223 F.3d 626, 634 n.4 (7th Cir. 2000).

Next, the state contends that Green's remarks during trial—indicating that he obtained Green's permission to waive certain evidentiary objections and learned from White information about Theresa Caldwell's testimony—show that his meetings with White must have been longer or that there must have been additional meetings not

reflected in the jail logs. The district court, however, believed White's testimony that he never met privately with Green other than during the two meetings at the jail, and the state provided no evidence that contradicted White's testimony on this point.[5] As the district court noted, "[r]eceiving White's permission to waive objections to leading questions would not have required much consultation," and Green's "remarks about jury selection and Theresa Caldwell's statement were consistent with White's testimony that they talked about those matters—but nothing else—during their brief meeting the night before trial."

On the question of Green's failure to explore the possibility of Bernice Caldwell's testifying, the state contends that the district court engaged in improper second-guessing of Green's trial strategy when it found Green's defense theory implausible compared to the alternative theory available through the testimony of White or Bernice Caldwell (or both), which (unlike Green's defense that attempted to lay responsibility on Michael White) would have been consistent with the testimony of Caldwell's daughter, Theresa. The state argues that it was reasonable for Green to base the defense on Michael White's involvement, given Johnson's initial statement implicating Michael, and points out that, in the end, Michael's alibi was never explored at trial. The state's failure to pre-

---

[5] The court also heard testimony from a witness familiar with the Champaign county courthouse, who said that the courthouse lacked facilities for private consultations during the trial. The state sought to rebut this testimony by way of an affidavit from a witness who allegedly saw White talking to his lawyers during jury selection and trial. But the affidavit was untimely (submitted 4 months after the close of evidence and without an explanation for the delay) and the district court was therefore within its discretion in excluding it. *Kafka v. Truck Ins. Exchange*, 19 F.3d 383, 388 (7th Cir. 1994).

sent evidence of Michael's alibi, of course, could not have been known to Green before trial, and in assessing Green's performance, we must rely on the facts "viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 689. By the time of his consultation on the night before trial (the only time any substantive issues were discussed), Green knew, or should have known, from discovery materials produced to the defense, that police had confirmed Michael White's alibi and that Theresa Caldwell would corroborate Johnson's testimony that it was Jerome White who met with him on the night the murder was planned. Green's failure to discuss with White or investigate the alternative defense that could have been supported by Bernice Caldwell's testimony simply cannot be attributed to strategic decisionmaking when he had not explored the facts necessary to make that decision. *See Strickland*, 466 U.S. at 690 ("[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."). In the words of the district court, "Green could not have made a strategic decision to reject White's [and Caldwell's] explanation as a defense theory if he never bothered to hear it in the first place."

Nevertheless, the state asserts that Green's representation was adequate when viewed as a whole. The state relies, for example, on Green's cross-examination of Johnson to show his preparation and mastery of the facts. But, as the district court points out, most of the cross-examination was designed to further the theory that Michael White was to blame, and on this issue, Green's questions displayed confusion—not mastery—of the facts. For example, Green sought to establish that the change in Johnson's story could be attributed to his close, longstanding relationship with Michael, but instead elicited testimony that Johnson had gone to school with Jerome White and actually knew him better. In any event, we fail to see how

the thoroughness with which Green may or may not have pursued his own theory of the case can compensate for his failure to discuss with White or consider a defense based on White's version of events—a necessary step before Green could made a reasonable decision about which course to follow.

Finally, the state asserts that the district court gave too little weight to the participation of Charles Aron, an attorney with whom Green shared office space. Aron testified at deposition that he did not independently consult with White (he was present at Green's second meeting with White) and did not interview witnesses or otherwise investigate the facts. Aron described his role in the defense as "carrying the briefcase." The state points out, however, that Aron participated in some of the preliminaries before opening statements, argued motions in limine, and represented White at sentencing, but none of this undermines the district court's finding that Aron did not undertake any independent investigation and did not separately consult with Green. Given this finding, which was amply supported by White's and Aron's testimony, Aron's participation in other matters sheds no light on the question whether Green's representation was adequate.

We find no clear error in the district court's findings of fact, and hold that Green's brief consultation with White and his failure to explore the possibility of Bernice Caldwell's testifying fell below the standard of reasonably effective representation.


B.  Prejudice

In the earlier appeal, we held that the jury might well have believed the alternative defense that Johnson and Walker stole the guns and rental car when White and Caldwell were sleeping. We concluded that there was a reasonable probability that the outcome would have been

different were it not for Green's performance and held that, assuming that White could prove on remand that Green's performance was deficient, he had sufficiently shown prejudice so that the petition for writ of habeas corpus should be granted. *White I*, 143 F.3d at 1056.

The state takes issue with this holding, but under the law of the case doctrine, we do not reopen issues decided in earlier stages of the same litigation unless we have a strong conviction that the earlier ruling was wrong and the party that benefitted from the earlier ruling would not be unduly harmed. *Avitia v. Metro. Club of Chicago,* 49 F.3d 1219, 1227 (7th Cir. 1995). The state's main argument that our finding of prejudice was wrong is that Green's failure to consult White about or investigate the alternative defense would not have mattered because it was unlikely that Bernice Caldwell would have testified at White's trial. In support, the state points out that Caldwell was a fugitive for much of the time before White's trial, suggests that she might not have been willing to testify, and that Caldwell's proposed testimony—as described in her affidavit—might have been a later creation. But the state does not identify any evidence to contradict Caldwell's statement in her affidavit that she would have testified at White's trial in a manner consistent with the alternative defense suggested by White. The state's speculation about alternative possible scenarios—in which Green's failure to investigate Caldwell's possible testimony would not have mattered— is affirmatively rebutted by Caldwell's affidavit, and the state does not argue that the affidavit should not have been admitted or considered by us in our earlier holding on the question of prejudice.[6]

---

[6] Furthermore, our holding of prejudice was not necessarily dependant on Caldwell's testifying. We said that there was a

(continued...)

In a similar vein, the state argues that our finding of prejudice was erroneous because the alternative defense supported by Caldwell's or White's potential testimony was weak. The state suggests that the jury might not have believed Bernice Caldwell, who was in competition with and fought with Jackson and his prostitutes, who secured the guns and rental car used in the crime, and who ultimately was convicted after employing the very defense we faulted Green for failing to develop. We were aware of these possibilities in our earlier evaluation of prejudice and acknowledged that the outcome under the alternative defense was far from certain:

> The jury might well have chosen not to believe this alternative story, just as it apparently disbelieved the defense based on the claim that Michael White ordered the murder. But there is at least a reasonable probability that the jury would have seen matters differently if Caldwell, White, or both of them had testified to their version of events. Instead of being given a choice between two statements by the killer himself, only one of which was consistent with Theresa Caldwell's testimony, the jury would have been given a choice between Johnson's story and a second, equally plausible story told by Caldwell and White. Theresa Caldwell's testimony no longer would have been fatal to the defense, because it would have been entirely consistent with the theory that Johnson and Walker stole the guns and the car after Caldwell and White went to bed.

---

[6] (...continued)
reasonable probability that the result would have been different if "Caldwell, White, *or* both of them had testified to their version of events." *White I*, 143 F.3d 1056 (emphasis added). White's testimony at the evidentiary hearing confirmed that he was prepared to testify to his version of events.

*White I*, 143 F.3d at 1056. And in evaluating a claim of prejudice, the question is not whether counsel's deficient performance more likely than not made a difference in the outcome; rather, it is whether there is a "reasonable probability" that the result would have been different, meaning "a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 693-94. We answered that question in the earlier appeal and the state hasn't pointed to argument or facts that we overlooked or misapprehended sufficient to give us a strong conviction that the earlier holding was wrong. *See Avitia,* 49 F.3d at 1227; *compare Bebout v. Norfolk & W. Ry. Co.,* 47 F.3d 876, 879 (7th Cir. 1995) (reversing a decision on subsequent appeal because the court based its prior decision on mistaken facts). Accordingly, we decline to revisit the question.

### III.  CONCLUSION

We conclude that Green's performance at White's trial fell below the standards of reasonable representation. Given our earlier holding that White had established prejudice from this representation, we affirm the judgment of the district court.

A true Copy:

　　　Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*

USCA-97-C-006—8-22-02